UNITED STATES of America, Appellee,

v.

James J. COYNE, Jr., Defendant–Appellant.

No. 1358, Docket 92–1688.

United States Court of Appeals, Second Circuit.

Argued April 14, 1993.

Decided July 30, 1993.

James A. Resila, Albany, NY (Carter, Conboy, Bardwell, Case, Blackmore & Napierski, of counsel), for defendant-appellant.

Thomas Spina, Jr., Asst. U.S. Atty., Albany, NY (Gary L. Sharpe, U.S. Atty., N.D.N.Y., George A. Yanthis, Asst. U.S. Atty., of counsel), for appellee.

Before: VAN GRAAFEILAND and WINTER, Circuit Judges, and POLLACK, District Judge.*

WINTER, Circuit Judge:

James J. Coyne, Jr. appeals from his conviction and sentence after a jury trial before Judge Gagliardi. He was convicted of conspiracy to violate the federal bribery statute, 18 U.S.C. former § 666(b) & (c) (Supp.1984), in violation of 18 U.S.C. § 371 (1988) (Count I), corruptly accepting a thing of value concerning his conduct as Albany County Executive in violation of the federal bribery statute, 18 U.S.C. former § 666(b) (Count II), extortion under color of official right (Hobbs Act) in violation of 18 U.S.C. § 1951 (1988) (Count III), conspiracy to commit mail fraud and violate 18 U.S.C. § 666(a)(1)(B) and (a)(2) (1988), in violation of 18 U.S.C. § 371 (1988)

---

* The Honorable Milton H. Pollack, United States District Judge for the Southern District of New York, sitting by designation.

(Count V), mail fraud, in violation of 18 U.S.C. § 1341 (1988) (Count VI), and corruptly accepting a thing of value concerning a program receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (1988) (Count VII). He was acquitted on Count IV, which charged him with violating 26 U.S.C. § 7206(1) (1988) by knowingly failing to report taxable income. He was also convicted of other offenses that we need not address for purposes of this appeal.

Coyne argues that there was: (1) a failure to prove conduct prohibited by the federal bribery statute because the project related to the bribes was not directly aided by federal funds; (2) insufficient evidence as to a deprivation of money or property for the mail fraud conviction; (3) no effect on interstate commerce under the Hobbs Act; (4) insufficient evidence on all counts; (5) a constructive amendment of the indictment; (6) error in the jury charge; (7) evidentiary errors; and (8) an erroneous two point enhancement for obstruction of justice. We affirm.

## BACKGROUND

The criminal charges against Coyne arose from his relationship with two firms during his tenure as the elected Albany County Executive. Counts I–III involved payments received from an architectural firm, Crozier Associates, P.C. Counts V–VII involved dealings with an automobile dealership, Bud Kearney, Inc., and with a co-owner of the dealership.

### A. Counts I–III—Crozier Associates

Coyne, in addition to being County Executive, also served as one of the three appointed members of the Albany County Industrial Developmental Agency ("IDA"). The IDA oversaw the development of a multi-purpose civic center, now known as the Knickerbocker Arena, until the summer of 1985. Joseph V. Zumbo, an Albany attorney who described himself as Coyne's best friend, was counsel to the IDA. During this period, when Coyne played a leadership role on the IDA, it retained an architectural firm, Crozier–Phillippi Associates, P.C., a predecessor of Crozier Associates, P.C., to perform certain preliminary studies for the construction of a civic center. John G. Crozier, an owner of Crozier–Phillippi, was the president of Crozier Associates and a long-time friend of Coyne. Crozier–Phillippi Associates received approximately $218,000 for this work.

In the summer of 1985, the Albany County Legislature took control of the civic center project due to limitations on the funding of such projects through IDAs. The Legislature established a nine-member Special Civic Center Committee ("Special Committee") to oversee the project and to make recommendations to the Legislature. Coyne was not a member of the Special Committee.

However, Coyne remained actively involved in the civic center project after the Legislature assumed oversight. He was described by Michael Polovina, the county project manager for construction of the civic center, as "spearheading" the project. Coyne was thus a member of the Civic Center Steering Committee formed in the spring of 1986. The Steering Committee was not an official body, but, according to Polovina, "was a group comprised of the key decision makers and people involved with the project." The Steering Committee included Harold Joyce, then majority leader of the Legislature and chair of the Special Committee. Joyce testified that he would not have supported the civic center project without Coyne's approval.

Coyne arranged a meeting at which he and Crozier presented a model of the proposed civic center to Special Committee members and other members of the community. This meeting took place prior to the Special Committee's interview of Crozier for the architect position. In 1986, the Special Committee recommended to the Legislature that Crozier Associates be selected as the architect for the civic center project. The Special Committee interviewed no other architects. The legislature agreed, and, on April 18, 1986, Crozier signed a contract with the County to provide the designated architectural services. Coyne executed the contract on behalf of the County. Initially, Crozier was to receive a maximum fee of $2,275,000, approximately seven percent of the construction costs.

In June or July 1986, Coyne informed Crozier that he had "serious financial problems." Crozier approached Zumbo for assistance in helping Coyne, explaining that Coyne had asked for $30,000. Although Zumbo initially testified that Crozier wanted his help in loaning Coyne money, Zumbo subsequently admitted that he could not recall whether Crozier actually used the word "loan." Zumbo also testified that he "suggested setting it up as a loan from Mr. Crozier to myself and from myself to Mr. Coyne" in order to "legitimize" it. Coyne testified that he asked Zumbo to meet with Crozier regarding the transaction and that he had a conversation with Crozier and Zumbo regarding whether Crozier could legally loan him the money.

In early July 1986, Crozier gave Zumbo a personal check for $30,000. The check was payable to Joseph V. Zumbo, Esq., and had the notation "real estate dev." on it. However, Zumbo had never done any real estate development work for Crozier. The Crozier Associates books initially listed the $30,000 as a loan to officer but later reclassified it as a salary expense for compensation to Crozier.

Zumbo deposited the check into his law office's general operating account. On July 9, 1986, Zumbo gave Coyne a $30,000 check written on the general operating account. On or about July 9, Coyne deposited $30,000 into his personal bank account. The checks, the records of Crozier Associates, and Coyne's deposit in his checking account were the sole contemporaneous documents evidencing the transaction. Neither Crozier nor Coyne listed the $30,000 as an asset or liability on any financial statements. Zumbo's trial testimony that the transaction was a loan was contradicted by his earlier grand jury testimony that Crozier "wasn't sure whether he was ever going to get paid back and it didn't really matter [to him]."

In February 1988, Coyne lobbied members of the Legislature for an enclosed front entrance to the civic center. In addition, he appeared before the Special Committee to recommend additional corporate suites and commercial spaces. The Legislature approved these alterations, which substantially increased the construction costs of the civic center. Because Crozier's fees were seven percent of construction costs, including major alterations, the Legislature's acts increased his fees also, to $3,700,000. As County Executive, Coyne signed each of the county claim forms submitted by Crozier Associates, certifying that the services were provided. He also assisted Crozier at various times in obtaining expedited payments under the contract.

In 1985, Albany County received federal financial assistance of $43,493,481 and $40,112,952 in 1985 and 1986 respectively. None of this assistance was earmarked for the civic center project.

In January 1989, Coyne was informed by the Internal Revenue Service that he was under criminal investigation for the tax years 1984–1987. Coyne then asked Zumbo to prepare documents concerning the $30,000 he received in 1986. Coyne told Zumbo that it was in everybody's best interest to prepare the documents. Between February and April of 1989, Zumbo prepared a promissory note for $30,000 from Coyne to him. The note was backdated to July 7, 1986. Coyne signed the backdated promissory note. In January 1991, Zumbo prepared a promissory note from himself to Crozier. He also backdated this promissory note to July 7, 1986. Zumbo mailed the promissory note to Crozier.

Also between February and April of 1989, Zumbo prepared a stock sale agreement between Coyne and himself for the sale of all of Coyne's shares in Eastco, a title insurance agency Zumbo and Coyne "had together." Zumbo backdated the stock sale agreement to July 7, 1986. Zumbo purchased twenty-nine shares of Eastco stock from Coyne for $1500 per share. The sale agreement purported to give an additional twenty shares to Zumbo as repayment of the $30,000 "loan." Zumbo testified that twenty of those forty-nine shares were intended to pay off the $30,000 "loan." Zumbo further testified that the "officers of the corporation . . . ., basically, Mr. Coyne, [Zumbo] and Mr. Richey, who was the chairman of the board, and Mr. O'Connor, all agreed that [$1500 per share] was a fair price for the stock at that point."

However, Zumbo also testified that in February 1989, less than two months earlier, he had sold eighteen shares of Eastco stock to a third party for $100 per share. There was no evidence of events between February and April 1989 explaining the seemingly dramatic increase in the value of Eastco's shares or the decrease in value between the selected backdate of July 1986 and April 1989. Nor was there evidence of any other attempt by Coyne to pay off the "loan."

Four counts in the indictment arose out of these events. Count I charged Coyne with violating 18 U.S.C. § 371 by conspiring with Crozier and Zumbo to solicit, accept, and agree to accept the $30,000 from Crozier, and to offer, give and agree to give the $30,000 to Coyne, because of Coyne's conduct involving the business of Albany County and IDA, in violation of 18 U.S.C. former § 666(b) and (c). Count II charged Crozier with accepting the $30,000 in violation of 18 U.S.C. former §§ 666(b) and 2. Count III charged that Coyne's receipt of $30,000 from Crozier constituted extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 2. Coyne was acquitted of Count IV, which charged him with knowingly failing to report the $30,000 as taxable income on his 1986 federal income tax return, in violation of 26 U.S.C. § 7206(1).

### B. *Counts V–VII—Bud Kearney, Inc.*

#### 1. The Ford LTD and Mercury Sable Transaction

John N. ("Bud") Kearney was the founder and co-owner of Bud Kearney, Inc., a Ford/Mercury dealership in Albany County. John H. Kearney, Bud Kearney's son, was a co-owner and in charge of daily operations. Coyne had been a friend of the Kearney family for forty years.

During Coyne's tenure as County Executive, the County purchased three new vehicles for his use, all from Bud Kearney, Inc. In June 1988, the County traded in five vehicles to Bud Kearney, Inc. toward the purchase of the new vehicles. One of the five vehicles traded in was a 1984 Ford LTD that Coyne had driven for a time as County Executive. Bud Kearney, Inc. then gave the Ford LTD to Coyne, who gave it to his daughter. However, both she and Coyne used it. The Ford LTD had a retail value of $5,625.

During this same time period, Coyne informed John H. Kearney that there would be bids for the purchase of another County car for his use, and that he wanted a Mercury Sable. Coyne specified numerous features as necessary, including leather seats, a sunroof, a maroon exterior, a gray interior, a particular tire size, certain rearview mirrors, and power seats. On July 5, the County published bids for the car. Bids were opened on July 28. However, on June 7, Bud Kearney, Inc. ordered a Mercury Sable that contained every feature Coyne wanted. Because of production schedules for 1989 models, June 8 was the last day a dealer could order a new 1988 Mercury Sable. When the bids were opened on July 28, another dealer's bid was $788 less than the Bud Kearney, Inc. bid, but that car did not meet Coyne's specifications. The Bud Kearney, Inc. bid was accepted.

#### 2. The Dive Team Transaction

On August 24, 1988, two days before the delivery of Coyne's new Mercury Sable, John H. Kearney sent a letter to Coyne requesting a $5,000 appropriation for the Five Chiefs Search and Recovery Dive Team. Coyne told his budget director to put a line item for $5,000 into the executive budget, which was represented as an amount requested by the Albany County Department of Natural Disasters and Civil Defense ("Civil Defense Department"). In fact, Coyne did not consult the Civil Defense Department. The $5,000 was eventually included in Albany County's 1989 budget.

In late 1988, the Five Chiefs changed their name to the Coeymans Dive Rescue Team. Kearney resigned from the Coeymans team in March 1989. In the summer of 1989, the Coeymans dive team made numerous requests for the money to purchase equipment but never received funding. However, in April 1990, Coyne announced that he had formed a new dive team, the Albany County Dive Team. Equipment had been purchased by the County for this team beginning in December 1989. Although the director of the Civil Defense Department and his assis-

tant were the only ones authorized to sign the requisitions for this equipment, they did not do so. Rather, Kearney, who was not a county employee, signed the director's name and then initialed it.

In 1988, Albany County received $24,604,072 in federal financial assistance. None of this money was earmarked for the purchase of cars or equipment for dive teams.

### 3. The Counts Relating to Bud Kearney, Inc.

Counts V, VI and VII related to the Kearney transactions. Count V charged Coyne with violating 18 U.S.C. § 371 by conspiring with Kearney to accept and offer the 1984 Ford LTD in order to influence and reward Coyne in connection with the Mercury Sable bid, in violation of 18 U.S.C. § 666(a)(1)(B), (a)(2). Count V also charged that Coyne violated 18 U.S.C. § 371 by conspiring with Coyne to commit mail fraud in violation of 18 U.S.C. § 1341, citing as overt acts Kearney's use of the mail to request funds for the Five Chiefs Dive Team and Coyne's placing of two telephone calls to Kearney from California approximately six weeks prior to the delivery of the Ford LTD. Count VI charged Coyne with committing mail fraud in violation of 18 U.S.C. § 1341, alleging that Coyne used the mails to execute a scheme to obtain money and property from Albany County by means of false and fraudulent pretenses. It charged that this scheme caused Albany County to purchase cars from Bud Kearney at prices higher than those offered by competitors and that it caused Albany County unnecessarily to fund a dive team where previously none had been funded by the County, and where there was already one functional dive team in existence. Count VII charged Coyne with violating 18 U.S.C. §§ 666(a)(1)(B) and 2 by accepting the Ford LTD from Kearney, intending to be influenced and rewarded in connection with the purchase of the 1988 Mercury Sable, the purchase of other cars by Albany County, and the funding of the dive rescue team.

### DISCUSSION

### I. *The Bribery Charges*

■ Coyne first argues that his conduct is not covered by Section 666, the federal bribery statute. He frames his argument as jurisdictional because the designated jurisdictional amount of federal assistance, $10,000, was purportedly not met. Although federal financial assistance to the County was at all pertinent times in excess of that amount, neither the civic center project, the automobile purchases, nor the dive team were supported by federal funds. Coyne argues that, for purposes of Section 666(b), the federal assistance in question must be earmarked for the project at issue.

At the time of the offenses alleged in Counts I (conspiring to violate § 666(b) & (c)) and II (violating § 666(b)), Section 666(b) provided:

> Whoever, being an agent of an organization, or of a State or local government agency, described in subsection (a), solicits, demands, accepts, or agrees to accept anything of value from a person or organization other than his employer or principal for or because of the recipient's conduct in any transaction or matter or a series of transactions or matters involving $5,000 or more concerning the affairs of such organization or State or local government agency, shall be imprisoned....

18 U.S.C. § 666(b) (Supp.1984). Section 666(a) defines an organization or a state or local government agency as one "that receives benefits in excess of $10,000 in any one year period pursuant to a Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance." 18 U.S.C. § 666(a) (Supp.1984). The statute was amended in 1986, but not in any way material to the instant matter.

■ The Supreme Court has instructed that "[c]ourts ... applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language." *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985) (quoting *Garcia v. United States*, 469 U.S. 70, 75,

105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984)). The statutory language of Section 666 requires proof only that the accused be an agent of a local government that received in excess of $10,000 of federal funds in the one year period. The language neither explicitly nor implicitly requires that the $10,000 be directly linked to the program that was the subject of the bribe.

Appellant cites several portions of what he describes as legislative history that purportedly reflect a congressional intent to limit the reach of the legislation to bribery in specific local programs that are directly funded by the federal government. Our analysis of that legislative history begins with the Senate Report that accompanied Section 666(b). It stated:

PART C—PROGRAM FRAUD AND BRIBERY

*1. In general*

This part of title XI is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program. The proposal is derived from S. 1630, the Criminal Code Reform Act of 1981 approved by the Committee in the 97th Congress.[1]

[1] See, e.g., sections 1731 (Theft) and 1751 (Commercial Bribery) of S. 1630 and the discussion at pages 726 and 803 of S.Rept. No. 97–307 (97th Cong., 1st Sess.).

*2. Present Federal law*

As indicated, this part of title XI covers both theft and bribery type offenses.... [T]here is no statute of general applicability in this area, and thefts from other organizations or governments receiving Federal financial assistance can be prosecuted under the general theft of Federal property statute, 18 U.S.C. 641, only if it can be shown that the property stolen is property of the United States. In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds

cannot be shown. This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds. Indeed, a recurring problem in this area (as well as in the related area of bribery of the administrators of such funds) has been that State and local prosecutors are often unwilling to commit their limited resources to pursue such thefts, deeming the United States the principal party aggrieved.

With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition in 18 U.S.C. 201(a) as anyone "acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function."....

*3. Provisions of the bill, as reported*

Part C adds a new section 666 to title 18, United States Code. Subsection (a) makes it a Federal crime for an officer, employee or agent of an organization or of a State or local government agency that receives benefits in excess of $10,000 per calendar year pursuant to a Federal program to steal, embezzle, obtain by fraud, willfully misapply or otherwise knowingly convert without authority property valued at $5,000 or more.... The terms "agent," "organization," "government agency," and "local" are defined in subsection (d) and require no further explication. The Committee intends that the term "Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance" be construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery.

S.Rep. No. 225, 98th Cong., 2d Sess. 369–70 (1984), U.S.Code Cong. & Admin.News 1984, pp. 3182, 3510, 3511.

Although appellant attempts to divine from this statement the limitation described above, we fail to see any implication, much less a direct expression, of such an intent. Indeed, most of the Report's discussion relates to thefts rather than bribes. Appellant's main focus, however, is on the final sentence of the first paragraph in the quoted text, which states that Section 666 was "derived from S. 1630 . . . approved by the Committee in the 97th Congress." This sentence is accompanied by the quoted footnote referring to S.Rep. No. 97–307, the Committee Report accompanying S. 1630. In this Report, appellant does find remarks supportive of his position [1] and asks us to read Section 666(b) in light of those remarks. We need not pause to question whether this derivative legislative history is the "extraordinary showing of contrary intentions" required by *Albertini* because the argument is fatally flawed for other reasons. Both the section of S. 1630 relating to theft and that relating to bribery included specific limitations that are not in Section 666. Section 1731(c)(34)'s prohibition on thefts was thus limited to thefts of "property [of] the [federally funded] program." More importantly, Section 1751(c)(1)(I)'s prohibition on bribery was limited to payments to an "agent or fiduciary of . . . an organization charged . . . with administering monies or property derived from a federal program, and the recipient's conduct is related to the administration of such program. . . ." In short, the legislative history of S. 1630 is unhelpful because the proposed legislation actually contained express limitations to property or conduct related to a program directly funded by the federal government. The failure of the 98th Congress to include such a limitation in Section 666 hardly reflects an intent helpful to Coyne—in fact a contrary inference can be drawn—much less an "extraordinary showing" of such an intent.

In so concluding, we agree with the other circuits who have considered the question.

In *United States v. Little*, 889 F.2d 1367 (5th Cir.1989), *cert. denied*, 495 U.S. 933, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990), the Fifth Circuit held that "if the agency received $10,-000 in any given year, then the agents were subject to Section 666. There is no requirement that the particular program be the recipient of the federal funds." *Id.* at 1369 (citing *United States v. Westmoreland*, 841 F.2d 572, 576 (5th Cir.) (stating that Section 666 did not require "the government to trace federal funds to the tainted transactions of a local government agency covered by the statute"), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988)); *see also United States v. Simas*, 937 F.2d 459, 463 (9th Cir. 1991).

## II. *Deprivation of Money or Property on Mail Fraud Counts V and VI*

Appellant argues that his conduct relating to Counts V and VI, which concern the Kearney transactions, did not deprive Albany County citizens of "money or property." The government concedes that at the time of the alleged conduct, the mail fraud statute reached only the deprivation of money or property interests. *See McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); 18 U.S.C. § 1346 (1988) (adding "scheme or artifice to deprive another of the intangible right of honest services"). However, the evidence was sufficient to show a deprivation of money or property.

With regard to the purchase of the Mercury Sable, the jury was entitled to conclude that Coyne's detailed specifications for the car, and the tip to Bud Kearney, Inc., regarding those specifications, were intended to rig the bidding and caused the County to pay more for the car. The County accepted the Bud Kearney, Inc. bid even though it was $788 higher because the lower bid did not meet the rigged specifications for, *inter alia*, color, tire size, and rearview mirrors. With regard to the funding of the dive team, the

---

1. With regard to theft, the Committee Report states that it must be "from a [federally funded] program." S.Rep. No. 307, 97th Cong., 1st Sess. 726 (1981). With regard to bribery, the Committee Report states that the conduct of the recipient of the bribe must be "related to the administra- tion of [a federally funded] program." *Id.* at 803. It also states that the conduct sought to be influenced by the bribe must be "related to the administration of the [federally funded] program." *Id.*

jury could have easily concluded that the County was defrauded of $5,000 to outfit a new and duplicative dive team.

### III. *The Crozier Transaction Affected Interstate Commerce*

■ Appellant argues that the Crozier transaction did not affect interstate commerce. This argument is meritless. The effect on interstate commerce need only be slight. *See United States v. Scacchetti,* 668 F.2d 643, 647 (2d Cir.), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). The payment to Coyne was from Crozier Associates, a company doing business in interstate commerce, thereby depleting its assets.

### IV. *Sufficiency of The Evidence*

■ Appellant argues that the evidence was insufficient on all counts. However, he has failed to meet the "heavy burden" of showing that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after all inferences are drawn in favor of the government. *United States v. Butler,* 970 F.2d 1017, 1021–22 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).

First, with regard to Counts I–III, Coyne argues that he was not in a position to influence Crozier's receipt of work because the County Legislature had taken over decision-making from the IDA and that there could not have been a *quid pro quo.* However, there was evidence that Coyne provided material assistance to Crozier in obtaining the contract for architectural services on the civic center project on April 18, 1986, shortly before the $30,000 payment occurred. Subsequent to the payment, Coyne played an influential role on Crozier's behalf, including lobbying that aided Crozier in, *inter alia,* receiving increased fees for additions and expedited payments under the contract.

■ We have recently held, in a case involving these very transactions, that Section 666 covers payments for both past acts—a gratuity theory—and payments related to future acts—a bribery theory, *see United States v. Crozier,* 987 F.2d 893, 898–99 (2d

Cir.1993) (holding Section 666 should be construed to include gratuities). The evidence described in the preceding paragraph is more than sufficient with regard to either theory.

■ Second, Coyne argues that because he was acquitted on the tax fraud count the jury must have considered the $30,000 payment a loan. However, even if he is correct, an interest-free loan of $30,000 without contemporaneously documented terms is "something of value." *See id.* at 901. Third, he argues that the evidence as to Count III is insufficient because of a lack of proof of a *quid pro quo.* However, the Supreme Court held in *Evans v. United States,* — U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), that under the Hobbs Act "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for [specific] official acts." *Id.* at ——, 112 S.Ct. at 1889. After receiving the $30,000 payment, Coyne made numerous contacts on Crozier's behalf, lobbying legislators for changes that would increase Crozier's fees. Proof of an explicit promise at the time of payment to perform certain acts is not necessary, *see United States v. Garcia,* 992 F.2d 409, 414 (2d Cir.1993), and the jury was free to infer that Coyne accepted the $30,000 knowing that it was payment related to his using his influence as County Executive on Crozier's behalf as specific opportunities arose.

■ Fourth, appellant argues, as to Counts V and VII, that the gift of the 1984 Ford LTD was a gratuity and Section 666 "was not intended to be applied to gratuities." However, as noted, we have recently held otherwise. *See Crozier,* 987 F.2d at 898–99.

■ Finally, as to mail fraud Counts V and VI, the jury could easily have inferred that the Sable bidding was rigged, and that there was no need to fund a dive team that had previously operated without County funds, or to outfit a new dive team when one already existed.

## V. The Indictment Was Not Constructively Amended

■ A constructive amendment to an indictment occurs "when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Morgenstern,* 933 F.2d 1108, 1115 (2d Cir.1991) (quoting *United States v. Mollica,* 849 F.2d 723, 729 (2d Cir.1988), *cert. denied,* — U.S. —, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992). Constructive amendment of an indictment is a *per se* violation of the grand jury provision of the Fifth Amendment when such an amendment affects an essential element of the offense. *United States v. Roshko,* 969 F.2d 1, 5 (2d Cir.1992). Such a violation requires reversal of the conviction, without a showing of prejudice. *Id.* at 6.

■ Appellant argues that the indictment was constructively amended by the government's use of his membership on, and activities in, IDA to prove Counts I, II, and III. We disagree.[2]

Counts I and II of the indictment alleged that Coyne accepted $30,000 from Crozier "in connection with a series of transactions concerning Albany County and the IDA." Count III alleged that he committed extortion "while Albany County Executive and a member of the Albany County IDA." However, the indictment charged only that "from in or about April 1986 ... James J. Coyne, Jr. did ... conspire." Appellant argues, and the government appears to assume,[3] that appellant's involvement with IDA could not have been the basis for his conviction on Counts I, II, and III.

It appears from the record that the prosecution and the court held a different view for most of the trial and assumed that Coyne's pre–1986 conduct as an IDA member would support a conviction. The government made reference, without objection, to IDA in its opening, stating that "[a]s to the extortion under color of official right, the proof will show ... that architect Crozier consented to give this money to Coyne, at least in part in connection with Coyne's position as County Executive and as a member of the Albany County IDA." The government also questioned several witnesses about the role of IDA and Coyne's influence on that body.

However, at the charging conference, after all the evidence had been submitted, the district judge changed his mind. He reasoned that because the indictment charged only that "from in or about April 1986 ... the defendant did conspire," IDA involvement predating April 1986 could not have been criminal conduct. The indictment was therefore redacted before going to the jury to delete all statements that Coyne's alleged criminal conduct involved conduct in connection with IDA. Three references to IDA were retained, but only as "background" information. The district judge instructed the jury that only Coyne's conduct as Albany County Executive post-April 1986 could be found to be criminal. The court also declined to send IDA exhibits to the jury room. Finally, a reference to IDA in the government's summation was allowed by the district court, but again only as background.

Based on this record we see no possibility that appellant was convicted for his activities on IDA. Except for the remark quoted from the government's opening, which was, in light of subsequent events, entirely without effect, there was no purported expansion of the charges against Coyne. The jury was clearly instructed as to the acts for which it might convict and the indictment was redacted to narrow the charges to his conduct as County Executive. The "essential" elements of the offense were thus not "so modified" that there was a "substantial likelihood that the defendant may have been convicted of an

---

**2.** His argument that the indictment was amended by the government's contention that a loan may constitute "anything of value" under Section 666 fails. *See Crozier,* 987 F.2d at 901.

**3.** In view of our disposition of the case, we need not decide whether an indictment based on a gratuity theory—a payment for past favors—may allege that the conspiracy began only after the favors.

offense other than that charged in the indictment." *See Morgenstern,* 933 F.2d at 1115.

■ Moreover, IDA evidence was clearly admissible. The government was not required to prove post-April 1986 events without explanatory evidence concerning the circumstances that gave rise to those events. Coyne's membership on, and activity in, IDA was relevant to show his established relationships with Zumbo and Crozier prior to April 1986. It was also relevant to explain his subsequent involvement in the civic center project and to prove his ability to influence the Special Committee and the County Legislature on Crozier's behalf. It was thus admissible as background. *See United States v. Roldon–Zapata,* 916 F.2d 795, 804 (2d Cir.1990) (evidence of defendant's previous cocaine transactions admissible to provide background of conspiracy), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991); *see also United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). Indeed, appellant's attempt to convert what is an evidentiary issue into a constructive amendment argument is driven by the fact that the IDA evidence did not cast an unfavorable light upon him.

## VI. *The Jury Instructions Were Proper*

■ In reviewing a jury charge, "[f]irst, we must focus on the specific language challenged, to determine whether it passes muster. . . . Next, we must 'review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law.'" *United States v. Carr,* 880 F.2d 1550, 1555 (2d Cir.1989) (quoting *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987)); *see also United States v. Mollica,* 849 F.2d 723, 729 (2d Cir. 1988).

Coyne first challenges the jury charge on the bribery and extortion counts. The district court instructed the jury that the government must prove beyond a reasonable doubt that "the defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or intending to be influenced in connection with any business or transaction of Albany County." Coyne argues that the use of the phrase "at least in part" in the jury charge for Counts I–III, V and VII was error. However, in *United States v. Biaggi,* 909 F.2d 662, 683 (2d Cir. 1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991), we noted that there could be dual purposes for payments, stating that a "valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." The charge was entirely appropriate in light of Coyne's argument that he was motivated by friendship.

■ Appellant next argues that the district court gave an improper charge for Count III (Hobbs Act) based upon *Evans,* — U.S. at ——, 112 S.Ct. at 1889. *Evans* offers two slightly different statements of what satisfies the *quid pro quo* requirement derived from the statute's "under color of official right" language. *See id.* at ——, 112 S.Ct. at 1889 & n. 20. The Court stated in *Evans:*

> We reject petitioner's criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of *McCormick* . . . , because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense. . . . We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.

*Id.* at ——, 112 S.Ct. at 1889. Based on *Evans,* the district judge gave, in pertinent part, the following charge:

> In other words, you may only find the defendant guilty of this crime if you find that he obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts rather than being given voluntarily or unrelated to the defendant's office. The defendant need not have affirmatively induced the payment by his actions, but he must know the payment is offered in exchange for a specific requested exercise of

his official power in order to violate the statute.

During deliberations, the jury sent out a note inquiring whether a "specific requested exercise of official power [was] required to violate this statute." Counsel for Coyne then argued that a specific request was required and that the court should so instruct the jury. After a discussion, the court simply instructed the jury to reread the instructions.

The instruction was not error. Unlike the instructions in *Garcia*, it set out the *quid pro quo* requirement and tracked the Supreme Court's statement in *Evans*. Moreover, we have held since *Evans* that the government does not have to prove an explicit promise to perform a particular act made at the time of payment. *See Garcia*, 992 F.2d at 419. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise.

█ Finally, it was well within the district court's discretion to decline to charge the jury that it was legal to backdate the promissory notes. Indeed, although the jury subsequently acquitted Coyne on the tax charges and found the evidence that the $30,000 was a gift to be insufficient, it was hardly clear at the time of trial that the backdating was not chargeable at least as an obstruction of justice. *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1223 (2d Cir.1983) (backdated loan agreements are evidence of conspiracy to obstruct justice), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). We thus see neither error nor prejudice.

## VII. *Evidentiary Errors*

█ Appellant makes a host of arguments regarding evidentiary rulings. We review such rulings only for an abuse of discretion, and note that "the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence." *United States v. Rivera*, 971 F.2d

876, 885 (2d Cir.1992); *see also United States v. Maldonado–Rivera*, 922 F.2d 934, 956 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991).

Coyne argues that the district court erroneously precluded Coyne's development, through cross-examination of Polovina, of other motives for the county legislators in choosing Crozier Associates as the architect for the civic center project. However, the district court correctly ruled that such testimony was irrelevant where Coyne's conduct in attempting to influence the legislators was the sole issue. Similarly, the district court was within its discretion to preclude inquiry into the legality of backdating the promissory notes. The central issue was the motive for backdating the notes, and the government never expressly challenged the legality of that backdating.

We have considered Coyne's other evidentiary arguments and find them meritless.

## VIII. *Two–Point Enhancement for Obstruction of Justice*

█ Coyne's offense level was increased by two points for obstruction of justice, *see* U.S.S.G. § 3C1.1, as a result of the backdating of the promissory notes.[4] He argues that because he was acquitted of the tax evasion charge for not reporting the $30,000 as income, the jury must have concluded that the transaction was a loan and that he therefore did not obstruct the IRS investigation.

█ However, the sentencing court was free to find, as it did, that the backdating was an attempt to obstruct the government's investigation. The sentencing judge is not bound by the jury's acquittal, both because the issue relates to sentencing rather than guilt, *see United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), and because the government's burden of proving obstruction is by a preponderance of the evidence, *see Rivera*, 971 F.2d at 891. The jury's verdict thus indicates no more than that it found that the government did not prove beyond a reasonable doubt the

---

4. Section 3C1.1 provides:
   If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investiga-

tion, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels. U.S.S.G. § 3C1.1.

$30,000 was a gift. For sentencing purposes, the court was free to find that the backdating was an intentional attempt to thwart the investigation of a bribe. *See Sun Myung Moon,* 718 F.2d at 1223.

Coyne also argues that his obstruction of the investigation of the "instant offense" relates only to the IRS investigation and that, because he was acquitted of the tax charges, no enhancement can be applied. We do not take so constricted a view of Section 3C1.1. The fact that a particular agency of the federal government undertakes the initial investigation of possible criminal acts neither mitigates the culpability of an obstruction nor affects the enhancement of a sentence based on subsequent criminal charges not within the direct purview of that agency. So long as the investigation that is obstructed is related to those charges, an enhancement is proper.

Appellant alternatively argues that because the backdating was not an illegal act, it could not form the basis of an obstruction charge. Section 3C1.1 includes no requirement that the obstructive conduct be inherently illegal. Moreover, backdating that involves the creation of false documentation obviously can constitute an obstruction of justice. *Id.*

Affirmed.