**UNITED STATES of America,**

v.

**Linwood ROBERTS, Defendant.**

**No. 98 CR 459(ILG).**

United States District Court,
E.D. New York.

Nov. 4, 1998.

742

Lawrence S. Lustberg, Gibbons, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Frank V. Carone, Jr., Frank R. Seddio P.C., Brooklyn, NY, for Linwood Roberts.

Miriam R. Best, Senior Trial Counsel, United States Attorney's Office, Criminal Div., Brooklyn, NY, for U.S.

## MEMORANDUM & ORDER

GLASSER, District Judge.

### BACKGROUND

For the purposes of deciding this motion, the following facts are assumed to be true. In 1993, Carlton Nembhard, a Brooklyn mortgage broker, was introduced to Mariano ("Mario") Ventura, a technical support aide in the Brooklyn City Collector's office (a borough office of the New York City Department of Finance, or "DOF"). Ventura, who had worked at the Brooklyn City Collector's Office since 1985, was able to manipulate the DOF's records to make it falsely appear as though the property taxes and interest for specific properties had been paid. Beginning in March 1993, Ventura began falsifying these records at the behest of Nembhard.

The defendant Linwood Roberts ("Roberts"), a real estate agent and mortgage broker, was also involved in this fraud. Roberts brokered mortgages for clients, some of whom were also delinquent on their property taxes and interest charges. Roberts told these clients to pay him directly the amounts they owed for the outstanding taxes and interest and he promised to hold the money in escrow until their loans closed. Thereafter, Roberts would provide a list of these clients' properties to Nembhard, who subsequently brought the list to Ventura. Ventura would then fraudulently eliminate all the tax charges for these properties and give Nembhard a receipt showing that all the charges had been paid. Roberts subsequently took his clients' cash, which had been previously escrowed for the payment of the taxes, and split it between himself, Nembhard and Ventura. Both Roberts' clients and the DOF erroneously thought the taxes and interest had been paid.

The scheme lasted from 1993 until 1995, when the DOF changed its computer system. In March 1996, Ventura was arrested for his role in the scheme and began cooperating with the government. In September 1996, Nembhard was also arrested and he also began cooperating.

On April 30, 1998, Roberts was indicted and charged with violating Sections 371 and 666 of Title 18 of the United States Code. Defendant Roberts now moves to dismiss the indictment on the grounds that: (1) 18 U.S.C. § 666, as applied in the present case, exceeds Congress' authority to prosecute purely local criminal conduct; and (2) the government has failed to sufficiently allege or establish a jurisdictional element of the charged offense, i.e., that Ventura was an agent of a local government agency that received in excess of $10,000 in federal benefits. In the alternative, defendant moves for an order directing the government: (1) to provide him with a bill of particulars; and (2) to disclose to him specific *Brady* material.

### DISCUSSION

**I. Federalism**

18 U.S.C. § 666 states, in pertinent part, that:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

\* \* \* \* \* \*

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

■■■ Congress enacted 18 U.S.C. § 666 pursuant to its spending power. *United States v. Cantor*, 897 F.Supp. 110, 112 (S.D.N.Y.1995). It was designed to increase the protection of the integrity of federal funds disbursed through federal programs. *United States v. Foley*, 73 F.3d 484, 489 (2d Cir.1996). Here, the defendant seeks to dismiss the indictment because, he argues, the government's application of § 666 to the present case is an unconstitutional extension of federal power. *See* Def.'s Mem. at 3–5.

Roberts' "federalism argument" consists of two prongs. First, he argues that *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), precludes Congress from using its spending power to unconstitutionally enlarge the federal police power. *See* Def.'s Mem. at 4–5. Second, defendant maintains that, in this case, the connection between the bribery of Ventura and any federal funds is too attenuated to support an indictment under § 666. Each of these arguments is addressed in turn.

### A. The Lopez Argument

■■■ In *Lopez* the Supreme Court invalidated the Gun–Free School Zones Act of 1990, finding that the statute exceeded Congress' power to act under the Commerce Clause. Here, Roberts urges this Court to find that the present application of § 666 is a similar unconstitutional extension of Congressional power. Specifically, he argues that the Commerce Clause's constitutional limitations, as delineated by the Supreme Court in *Lopez*, should apply to the facts of this case. *See* Def. Mem. at 4–5. This Court does not agree.

Commerce Clause jurisprudence identifies three broad categories of activity that Congress may regulate under its commerce power. *Lopez* at 558, 115 S.Ct. 1624. "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624 (citations omitted).

In *Lopez*, the Court wrote that "[the Gun–Free School Zones Act of 1990] neither regulates a commercial activity nor contains a requirement that the possession [of guns] be connected in any way to interstate commerce." *Id.* at 551, 115 S.Ct. 1624. As such, the Court held that the Act exceeded the authority of Congress to regulate commerce and invalidated the statute based on a specific application of the Commerce Clause. *See id.*

The Supreme Court engages in an altogether different calculus when reviewing legislation enacted pursuant to Congress' spending power. In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court wrote "... legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the

States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' *See Chas C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–598, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)." *Lopez* and *Pennhurst* demonstrate that the Commerce Clause and the Spending Power have distinct applications, interpretations and limitations. Accordingly, the Commerce Clause analysis in *Lopez* is inapplicable to the evaluation of Congress' use of the Spending Power that is relevant here.

A review of the case law reveals that several courts have addressed and rejected "federalism" arguments directed at § 666. In *United States v. Ferrara*, 990 F.Supp. 146 (E.D.N.Y.1998), the Court, in response to the defendant's argument that the government is "endeavoring to federalize local conduct unrelated to federal monies," wrote:

> Federalism has not been compromised here. The federal government has a right to attach reasonable conditions to the disbursements of its funds. State and local governments are free to accept or reject federal monies so encumbered. The choice rests with them. And their ability to prosecute local bribery schemes is not impaired either. Rather, each jurisdiction—state and federal—may prosecute offenders consistent with their respective interests. This circumstance is not violative of the Tenth Amendment.

990 F.Supp. at 152 (citations omitted).

Similarly, in *United States v. Cantor*, 897 F.Supp. 110 (S.D.N.Y.1995), the court rejected defendant's Tenth Amendment challenge to § 666, finding that the section does not impose a condition on federal funds nor prevents state action. *Id.* at 113. The court also found that the "conduct prohibited by § 666 [was not] so remote from the federal interest in protecting federal funds from the effects of local bribery schemes as to exceed the scope of the Congressional spending power or to run afoul of the Tenth Amendment." *Id.*

Roberts criticizes *Cantor* and *Ferrara* for failing to discuss the Supreme Court's decision in *Lopez*. Def.'s Reply at 5. However, for the reasons stated above, Roberts' reliance on *Lopez* is misplaced and, as such, this Court is unpersuaded by defendant's *Lopez* argument.

## B. *The Federal Funds Connection*

■ Defendant argues that the absence of a connection between the bribery of Ventura and any federal funds precludes § 666 from applying to the facts of this case. The Government's response is that the DOF, the agency where Ventura worked and was bribed, receives and distributes federal funds in excess of $10,000. However, the Government's assertion that the DOF's "receipt and distribution" of the City's portion of federal funds is sufficient to satisfy the statute requires closer analysis.

In *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the Supreme Court had the opportunity to address § 666's "federal funds" requirement. In that case, a prisoner paid a bribe to the Sheriff of a Texas county in exchange for "contact visits" with his girlfriend. While that transaction did not implicate federal funds, a unanimous Court upheld the conviction. Specifically, the Court noted:

> The enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, *does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)*. Subject to the five-thousand-dollar threshold for the business or transaction in question, the statute forbids acceptance of a bribe by a covered official who intends "to be influenced or rewarded in connection with any business, transaction, or series of transactions of [the defined] organization, government or agency." § 666(a)(1)(B). The prohibition is not confined to a business or transaction which affects federal funds.

118 S.Ct. at 473 (emphasis added).

However, the Court explicitly withheld consideration of whether § 666 requires "some other kind of connection between a bribe and the expenditure of federal funds," finding a connection because the bribe relat-

ed to the housing of a prisoner in facilities paid for by federal funds. *Id.* at 474.

While *Salinas* does not require that the bribery "affect federal funds," it did not foreclose the possibility that there is an outer boundary beyond which the relationship between the bribe and the expenditure of federal funds is too remote to support § 666 jurisdiction. For example, one district court has written:

> In the abstract, nearly every organization in one way or another receives "benefits" in excess of $10,000 under a federal program. Nearly every organization, for example, has agents that use highways constructed in part with federal monies. Although such organizations may remotely "receive benefits in excess of $10,000 under a Federal program involving a grant or other form of Federal assistance," such organizations surely do not fall within § 666's jurisdictional reach.... [N]early every large grocery store chain directly receives more than $10,000 in food stamps as payment from customers. Although such chains would appear to receive benefits in excess of $10,000 under a Federal program ... surely a checkout clerk's theft of $5,000 in cash from a cash register does not constitute federal program fraud.

*United States v. LaHue,* 998 F.Supp. 1182, 1187 (D.Kan.1998).

In this case, the Government does not contend that the DOF received federal funds directly. Rather, it states that "all of the federal funding received by the City of New York is received and distributed *through* the DOF." Gov.Mem. at 19 (emphasis added). Here, the dispositive issue is whether the DOF's relationship to federal funds was sufficient to satisfy § 666—a survey of how other courts have addressed this issue indicates that it was.

In *United States v. Foley,* 73 F.3d 484 (2d Cir.1996), this Circuit found that § 666 "was not designed for the prosecution of corruption that was not shown in some way to touch upon federal funds." *Id.* at 493. In light of the unequivocal language in *Salinas* ("[the application of § 666] is not confined to a business or transaction which affects federal funds" 118 S.Ct. at 473) this Court joins with the Government in questioning whether *Foley* is still good law. *See* Gov.Mem. at 11. The holding here, however, is not dependent on discrediting *Foley* because, unlike that case, in this case federal funds were affected.

In *United States v. Zyskind,* 118 F.3d 113 (2d Cir.1997), the Second Circuit addressed the application of § 666 again. In that case, the court affirmed the conviction of the administrator of Hi–Li Manor Home for Adults ("Hi–Li"), reasoning that § 666's reach extended to organizations like Hi–Li, *id.* at 117, even though it was *not* a direct recipient of federal program funds. *Id.* at 114. However, as a legal custodian for many of its residents, Hi–Li received federal benefits on behalf of its wards. *Id.* Beryl Zyskind, Hi–Li's administrator, embezzled some of the benefits, and a jury found him guilty of program fraud. *Id.* Zyskind appealed, arguing that Hi–Li's receipt of its residents' benefits did not make Hi–Li a recipient of more than $10,000 under a federal program as required by § 666. *Id.* at 115.

The Second Circuit, recognizing the legislative intent to "protect the integrity of the vast sums of money distributed through Federal programs, ... conclude[d] that § 666 was designed broadly to prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are 'disbursed' [from the federal government] for further 'distribution' to or for the benefit of individual beneficiaries." *Id.* at 116.

The fact that Hi–Li was a conduit for federal funds was enough for the court to find that § 666's jurisdictional requirement had been satisfied. In this case, the DOF is also a conduit for federal funds. The cases are distinguishable, though, in that Hi–Li received federal funds directly from the government and then distributed the funds to the intended beneficiaries. Here, by contrast, the DOF received the funds from the City of New York only after the City received the funds from the federal government. This difference, however, does not prevent applying the *Zyskind* analysis to the

present case. Although the federal funds here must be transferred to the DOF from a separate organizational entity, in each case, the purpose of § 666 remains the same: "to protect the integrity of the vast sums of money distributed through Federal programs." *Zyskind,* 118 F.3d at 116. Accordingly, in the present case, this Court finds the connection between the DOF's receipt and distribution of federal funds and the bribery of Ventura sufficient to support an indictment under the statute without contravening important principles of federalism.

## II. The Federal Funding Requirement

As a threshold matter, this Court notes that the question of whether the DOF received federal funding in excess of $10,000 is a jurisdictional matter. *See U.S. v. Dransfield,* 913 F.Supp. 702, 707 (E.D.N.Y.1996). Accordingly, this Court may properly decide this issue on Roberts' pre-trial motion to dismiss. *See id.*

█ Roberts claims that indictment should be dismissed because the DOF did not directly receive any federal funds. In support of this argument, defendant relies on *United States v. Frega,* 933 F.Supp. 1536 (S.D.Cal. 1996), which noted that "[a] survey of published cases involving § 666 indicates that courts have required that this funding be shown to exist at a fairly specific level, and not at the general governmental level." 933 F.Supp. at 1542. On reading the cases cited by that court, however, this court concludes that those cases do not compel the same result here. For example, *United States v. Valentine,* 63 F.3d 459, 462 (6th Cir.1995), on which the *Frega* Court relies, did not require a showing that a specific municipal department, as opposed to the city government, received more than $10,000 in federal funding in a given year. Likewise in *United States v. Simas,* 937 F.2d 459 (9th Cir.1991), another case cited by the *Frega* Court, the issue was whether bribery counts should have been dismissed because the government had not traced any federal funds to the project for which the bribe was paid. The Ninth Circuit held that the government was not required to specifically trace the funds, and affirmed the conviction. 937 F.2d at 462–63.

The *Simas* Court did not find in § 666 a requirement that federal funding must be shown on a specific agency level in order for the statute to apply.

Defendant's additional cited authority is also distinguishable. In *United States v. Nichols,* 40 F.3d 999 (9th Cir.1994) (per curiam), the question presented was whether seized drug profits from the federal government constituted "benefits" under § 666. The court found that such sharing of seized assets was a "benefit" under the statute, *id.* at 1000–01, but did not address the question of whether the federal funding requirement had to be shown to exist at the specific agency level.

Courts that have directly addressed the question of whether § 666 requires the government to show bribery involving the specific state agency that received the federal funds have found no such requirement. In *United States v. Grossi,* 143 F.3d 348, 350 (7th Cir.1998), Judge Easterbrook wrote the following:

> The general assistance program is not an "organization, government, or agency". As its name implies, it is a program carried out by Bloom Township, a "government" subject to the statute if it receives more than $10,000 in federal money—as the Township concededly does. [The defendant] wants us to say that, unless the program or activity that was touched by bribery itself received $10,000 in federal funds, the "circumstance described in subsection (b)" does not obtain. Yet money is *fungible and its effect transcends program boundaries.* The general assistance program has more to spend on welfare (or dangle as a lure for bribes) if the federal government meets some of the Township's other expenses. (emphasis added).

Judge Easterbrook's analysis is applicable to this case: it is immaterial that the DOF did not directly receive federal funds—if it loses tax revenue due to fraud, the City's portion of federal funds may be forced to cover the shortfall.

Additional authority supports the Seventh Circuit's conclusion. In *United States v. Pretty,* 98 F.3d 1213 (10th Cir.1996), the

State Deputy Treasurer was convicted of violating § 666. The defendant argued that the statute did not apply to her because she was only an agent of the Treasurer and there was no evidence that the Treasurer received federal assistance in excess of $10,000. *Id.* at 1219. However, the court found that the defendant was also an agent of the State, which did receive federal assistance in excess of $10,000. *Id.* Thus, the court opined that § 666 applied to the defendant, even though the actual funds at issue could not be traced to a federal program. *Id.*

In *U.S v. Madrzyk,* 970 F.Supp. 642 (N.D.Ill.1997), the defendant, a Ward Alderman in Chicago, was charged under § 666 with arranging to have the City of Chicago hire a "ghost" employee—someone whom the defendant knew would not perform any work for the City to earn the monies and benefits that were paid to him. The defendant moved to dismiss the indictment for lack of subject matter jurisdiction arguing that he and the employee were agents of the City Council and not agents of the City. As such, he averred that the indictment was deficient because it failed to allege that the City Council received federal assistance in excess of $10,000. The court disagreed and found the defendant agents of both the City and the City Council. *Id.* at 645. Accordingly, it held that § 666 was applicable to the defendant, regardless of whether the City Council received federal assistance because the City itself received federal assistance in excess of $10,000 during the relevant years. *Id.*

Finally, the plain language of the statute drives this Court to the conclusion that the law does not require the government to prove that the corrupt public employee worked for an agency of government, and that the agency itself received federal funds. Rather, the corrupt public employee must be an agent of an organization, of a State or local government, or an agency thereof. 18 U.S.C. § 666(a)(1).

An "agent" means a "person authorized to act on behalf of ... a government and, in the case of an organization or government, included a[n] ... employee." 18 U.S.C. § 666(d)(1). A "government agency" means a "subdivision of the executive ... branch of government, including a department." 18 U.S.C. § 666(d)(2). Here, Roberts bribed Ventura, an employee of the Department of Finance, who was also a New York City employee. There is nothing in the statute or case law that requires the federally funded organization to be the original recipient of the federal funds. *See Foley* 73 F.3d at 490 ("[T]he government need not trace the federal funds received by an organization to the project in connection with which its employee received a bribe."); *United States v. Coyne,* 4 F.3d 100, 108–110 (2d Cir.1993) (bribe in connection with civic center satisfied § 666 even though the county received no federal funds that were specifically earmarked for the civic center), *cert. denied,* 510 U.S. 1095, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994). Accordingly, this Court finds that the City of New York's receipt of federal funds and subsequent distribution through the DOF is sufficient to support the indictment under § 666.

### III. Bill of Particulars

■ Defendant seeks a bill of particulars, specifying the amounts of money offered by defendant or his accomplice to Ventura, as well as a detailed list of the specific federal benefits that the government will identify at trial as satisfying the $10,000 jurisdictional requirement of 18 U.S.C. § 666.

At the outset, it is noted that in the allegations of the complaint the government provides the defendant with the following information: (1) that the defendant kept 60% of his clients' unpaid taxes for himself, while his accomplices split the remaining 40%; (2) the location of the properties for which the City employee was bribed to perform fraudulent transactions; (3) the dates of the transactions; and (4) the amount of the taxes fraudulently deleted.

In *U.S. v. Desantis,* 802 F.Supp. 794, 797–98 (E.D.N.Y.1992) this Court had occasion to repeat the principle that:

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars to identify with specificity the nature of the charge pending against him so that he may prepare for trial, avoid surprise and to be able to claim

double jeopardy should he be prosecuted again for the same offense. . . . The decision to grant or deny a request for a bill of particulars rests within the sound discretion of the court. . . . As a general rule if the information the defendant seeks is to be found in the indictment or in some acceptable alternative form, no bill of particulars is required . . . . (citations omitted).

In this case, "[t]he indictment, together with the information provided to the defendants in other acceptable forms, satisfies such obligations as Rule 7(f) imposes upon the government. The charges pending against the defendants are defined with sufficient specificity to enable them to prepare for trial without being surprised and to plead the bar of double jeopardy at another time should that become necessary. To direct the government to comply with the requests made by the defendants would be to direct the government to particularize all of its evidence and the theory of its case, which it is not required to do." *Desantis* at 798.

The defendant also asks the government to provide a detailed bill of particulars setting forth the specific federal benefits it will identify at trial to satisfy the $10,000 jurisdictional requirement of 18 U.S.C. § 666(b). For the reasons noted above, this court finds that the protected entity in this case is New York City. Accordingly, the government has already provided the defendant with information regarding the amounts of federal funding that New York City received during the relevant time period. *See* Gov. Opp'n Ex. 3.

### IV. The *Brady* Request

The defendant has made requests pursuant to *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and *United States v. Bagley,* 469 U.S. 1016, 105 S.Ct. 427, 83 L.Ed.2d 354 (1984). Def.'s Mem. at 15–16. In response to those requests the government has acknowledged its *Brady* and *Giglio* obligations. In this regard observations made by the Court in *Pennsylvania v. Ritchie,* 480 U.S. 39, 59–60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) may be useful.

"A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. . . . Although the eye of an advocate may be helpful to a defendant in ferreting out information, . . . this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it is the State which decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. *See Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) ('There is no general constitutional right to discovery in a criminal case and Brady did not create one.')"

### CONCLUSION

For the reasons above, defendants motion to dismiss the indictment, for a bill of particulars and for specific *Brady* material is denied.

SO ORDERED.