Joseph J. SANTOPIETRO, Petitioner,

v.

UNITED STATES of America,
Respondent.

Perry A. PISCIOTTI, Petitioner,

v.

UNITED STATES of America,
Respondent.

Paul R. VITARELLI, Petitioner,

v.

UNITED STATES of America,
Respondent.

Nos. 3:96 CV 957 (GLG), 3:91 CR 65 (TFGD), 3:96 CV 1411 (GLG), 3:91 CR 65 (TFGD), 3:96 CV 1175 (GLG), 3:91 CR 65 (TFGD).

United States District Court,
D. Connecticut.

Dec. 4, 1996.

Leonard C. Boyle, Assistant U.S. Attorney, New Haven, CT, Thomas J. Murphy, Assistant U.S. Attorney, New Haven, CT, for Respondents.

Eileen McGann, Cummings & Lockwood, Stamford, CT, for Petitioner Santopietro.

Andrew A. Feinstein, Simsbury, CT, for Petitioner Pisciotti:

Paul R. Vitarelli, Waterbury, CT, pro se.

### Decision on Petitions Pursuant to 28 U.S.C. § 2255 to Vacate and Set Aside Sentences of Conviction

GOETTEL, District Judge.

In the early part of this decade, the United States Justice Department launched an investigation into corruption in municipal and state government in Connecticut. The initial indictment returned in 1991, *United States v. Santopietro, et al.,* (3:91 CR 0065 (TFGD)) named eight defendants including: Joseph J. Santopietro, the Mayor of the City of Waterbury; Perry A. Pisciotti, who had served as a Waterbury Republican State Central Committeeman and Town Chairman; and Paul R. Vitarelli, who was President of the Waterbury Board of Aldermen. The final indictment implicated Richard Foley, who had been the Republican State Party Chairman. The recent overturning of Foley's conviction, *United States v. Foley,* 73 F.3d 484 (2d Cir. 1996), gave rise to the three petitions currently under consideration by this Court.

The defendants in the *Santopietro* case were on trial for five weeks during March and April of 1992 before the late Honorable T.F. Gilroy Daly. One of the defendants entered a guilty plea and the other seven were found guilty of various crimes central to which was a conspiracy to receive bribes in violation of 18 U.S.C. § 371. This conspiracy involved a group of bankers'/developers' attempts to obtain favorable city action on projects in exchange for corrupt payments to public officials. These payments were not made in the old fashioned way of quietly delivering cash but rather were disguised as loans, option sales, leases, cancellations of leases, and contracts. The involvement of the Mayor was shielded by his payments usually passing to other persons. The defendants were found guilty of this conspiracy, as well as other offenses. Santopietro was found guilty of: five substantive counts of receiving bribes, 18 U.S.C. § 666(a)(1)(B); two counts of bank fraud, 18 U.S.C. § 1344; eight substantive counts of embezzlement of Job Training Partnership Act ("JTPA") grant money from the federal government, 18 U.S.C. § 665(a); conspiracy to embezzle

those funds, 18 U.S.C. § 371; and two counts of income tax evasion in violation of 26 U.S.C. § 7201. In addition to the general conspiracy count mentioned above, Pisciotti was also found guilty of making six illegal payments violating 18 U.S.C. § 666(a)(2) and one count of bank fraud violating 18 U.S.C. § 1344. Vitarelli was convicted of the above conspiracy count, one substantive count under 18 U.S.C. § 666(a)(1)(B), and one count of filing a false tax return, 26 U.S.C. § 7206(1).

At sentencing, Judge Daly gave Santopietro a term of 108 months with respect to the § 666 violations and concurrent 60–month sentences on the two conspiracy counts, the bank fraud counts and the tax evasion counts. Santopietro also received concurrent 24–month sentences on each of the JTPA embezzlement counts. Pisciotti received a term of incarceration of 114 months on his § 666 violations plus concurrent sentences of 60 months on the conspiracy and bank fraud convictions. Vitarelli was sentenced concurrently to a 41–month term of incarceration on the overall conspiracy, 39 months on his § 666 violation, and 36 months on the false tax return count.

All the convicted defendants appealed. A unanimous Second Circuit panel observed:

> Joseph J. Santopietro became the mayor of Waterbury, Connecticut, in November 1985. His victory was due in part to a feud between factions of the city's Democratic party, which had been in power for the previous ten years. The Republicans' uncertainty that they would be able to retain the power they had won fueled a "get it while we can" mentality among Santopietro and his close associates. Perry Pisciotti, a former GOP town chairman who was close to Santopietro's family, arranged for Santopietro to use his political position to influence decisions by various city agencies in return for bank loans and cash payoffs from certain local businessmen. Santopietro was reelected twice, and the conspiracy expanded in 1988 to include other Waterbury politicians.

> Benefits to certain bankers and land developers included zoning changes, subdivision approvals, confidential appraisal information for use in bidding on city-owned property, expedited treatment from city agencies, and input into appointments. In return, Santopietro and other members of his administration received hundreds of thousands of dollars disguised as loans, sales of options, real estate contract cancellations, and property leases.

*United States v. Santopietro*, 996 F.2d 17, 18 (2d Cir.1993), *cert. denied*, 510 U.S. 1092, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). The convictions of all defendants were upheld, the Court noting that none of their appellate claims had any merits. 996 F.2d at 19. A writ of certiorari was denied by the Supreme Court. *See* 510 U.S. 1092, 114 S.Ct. 921–922, 127 L.Ed.2d 215.

Santopietro and Pisciotti, who had been serving their sentences, and Vitarelli, who recently completed serving his sentence, have all filed petitions seeking to have their convictions set aside. As noted earlier, these petitions were prompted at least in part (if not completely) by the recent Second Circuit's overturning of the conviction of Foley. *United States v. Foley*, 73 F.3d 484 (2d Cir. 1996).

Foley was a state legislator accused of accepting bribes in violation of § 666. The real estate developers who tendered the bribes were the same ones involved in petitioners' cases. Foley was tried before the same Judge and was prosecuted by the same Assistant United States Attorneys. While the purpose of the bribe differed somewhat (seeking to have a piece of legislation passed by the state legislature), the statutory violation charged, 18 U.S.C. § 666, was identical. That section provides that:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists—

> (1) being an agent ... of a State [or] local ... government

> \* \* \* \* \* \*

> (B) corruptly solicits ... or accepts ... anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transaction of such ...

government ... involving anything of value of $5,000 or more;

\* \* \* \* \* \*

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

It is clear that the governmental bodies involved in both cases (the State of Connecticut and the City of Waterbury) received federal government funds in excess of $10,000. Moreover, the amount of bribes involved in both cases well exceeded $5,000. However, the majority of the panel[1] in the *Foley* case concluded that to prove a violation of § 666 the prosecution must allege and prove that the "thing of value of $5,000 or more" was lost by the state or municipal body as to which the defendant had a relationship.

The decision also impliedly held that the loss had to be of federal funds given to the state organization. Foley had not raised that issue in the trial court, but the Court of Appeals held that the failure of the indictment to charge a federal offense was jurisdictional defect cognizant on appeal under the "plain-error" doctrine. The Court therefore reversed Foley's bribery conviction and remanded his tax fraud conviction for a new trial since it was unable to determine whether the verdict was based on the jury's conclusion that the bribery payments were not ordinary and necessary expenses or that the deduction was impermissible because the bribery payments were illegal under federal law.

We have previously granted bail to those petitioners still incarcerated pending a hearing on their petitions. Because the § 666 convictions accounted for most of the time to be served by the two still incarcerated petitioners, Pisciotti and Santopietro, and since it appeared clear that the *Foley* decision would, at a minimum, require setting aside the peti-

tioners' § 666 convictions, we found that the resentencing mandated by *Foley* might run less than what those petitioners had already served.

### The Current Petitions

The three petitions before this Court have much in common. All three start with the claim that the Court lacked jurisdiction to sentence them for the § 666 violations under the law of the Second Circuit as articulated in *Foley*. All three petitioners then go on to argue that their convictions of other crimes were fatally contaminated by the spillover effect of the § 666 charges in which they stood trial. Moreover, all three petitions claim ineffective assistance of counsel under the Sixth Amendment. The two petitioners convicted of tax offenses argue that under the *Foley* rationale, they should at a minimum get new trials on those offenses. Additional individual claims are also made and will be discussed below.

### The Bribery (§ 666) Conviction

As to the § 666 convictions of all three petitioners, we have already reluctantly concluded that, while we believe the Second Circuit decision in *Foley* was incorrect, we are bound by it and therefore must set aside those convictions including the initial conspiracy count based on that crime. (See this Court's Decision of September 12, 1996 on the Bail Applications.)

The government argues that the conspiracy count and one of the substantive counts (Count Eleven) which concern the Victoria Court condominium development in Waterbury could meet the new *Foley* requirements. In that particular case, the developers, on the basis of advance information improperly obtained by them concerning the appraisal of city-owned properties, successfully bid at the lowest possible price and purchased the land at less than what they might otherwise have paid. In the substantive count, Santopietro was accused of accepting a $14,000 loan payment made by the developers for his influence in providing the information at issue. Conse-

---

1. A strong dissent to this decision was filed by Senior Circuit Judge J. Edward Lumbard.

quently, the government argues that, at least as to Santopietro, those two counts should be allowed to remain.[2]

We do not reach the issue of whether Counts One and Eleven involved offenses meeting the requirements of *Foley*. It is clear that they were not plead in the *Foley* fashion or proved in that regard.[3] Moreover, the jury was specifically instructed that in order to convict under § 666 the "anything of value" would be "any item ... that the recipient or the giver considers to be worth something." Charge transcript pp. 63–64. No reference was made to a loss by the government. Consequently, we have no alternative except to grant the petitions as they pertain to all the substantive § 666 counts and the first conspiracy count.

### The Spillover Claims

■ Because of the need to set aside their § 666 convictions, all of the petitioners argue that their other convictions must also be set aside because of the spillover effect of their being tried for the § 666 bribery counts. While they make this argument broadly, none of them offers any evidence to support the claim.

We start by noting that, while the *Foley* Court held that municipal and state officials taking bribes does not constitute a federal offense unless the $5,000 requirement of the statute concerns a value to the state or municipal government and (possibly) involved the loss of donated federal funds of at least that amount, that does not mean, as the petitioners have argued, that the conduct was not illegal. Although, according to the Second Circuit, the receipt of such bribes was not a federal offense, it would clearly appear to be a state crime. *See* Conn.Gen.Stat. §§ 53a–148, 53a–147. Moreover, the proof of these bribes was, to a degree, evidence sup-

porting the other substantive charges against the various defendants.

We cannot say that the evidence of the byzantine web of transactions between the petitioners, which clearly concerned bribery and illegal transactions, would not have been admissible even without the § 666 charges. Indeed, as noted earlier, had *Foley* been the law before these indictments were returned, the initial conspiracy count and at least one of the other substantive § 666 charges could have been framed differently in the indictment resulting in a conviction of some of the § 666 charges. As will be discussed below, the § 666 convictions do not produce a cloud on the tax fraud convictions or on Pisciotti's bank fraud conviction in the fashion that occurred in *Foley*. These transactions were significant evidence of the manner in which the petitioners were colluding in municipal corruption. Consequently, we deny the petitions to the extent that they rest upon spillover claims as to other offenses.

### Ineffective Assistance of Counsel

Initially, all three petitioners claimed ineffective assistance of counsel.[4] A hearing was held on Pisciotti's claim during which he took the stand. He testified at great length concerning a number of complicated financial transactions. With respect to the one which gave rise to his conviction of bank fraud, his only remaining count of conviction after elimination of the § 666 charges, his version of the transaction differed somewhat from the government's proof. He admitted, however, that he was not making a legitimate bank loan. Shortly thereafter, he agreed to withdraw his claim of ineffective assistance of counsel.

■ Petitioner Vitarelli also raises a claim of ineffective assistance of counsel. He does not recite any specific failings of his counsel

---

**2.** The government concedes that if the substantive § 666 count is dismissed, there is no basis for upholding the conspiracy conviction, Count One of the indictment.

**3.** Santopietro was not on the Board of Aldermen and therefore not in a position to vote on the sale of the Victoria Court property. Therefore, proof of his involvement would have been rather circumspect.

**4.** The government argues that the claim of ineffective assistance of counsel at trial was waived by not being raised on appeal. However, the petitions also claim ineffective assistance of counsel on appeal. In light of our disposition of the issue on the merits, we do not further consider the question of whether the claim has been waived.

at trial but rather raises three issues concerning his convictions which he alleges were error and which he claims demonstrate that he had ineffective assistance of counsel. There is a reason for framing his claim under the rubric of ineffective assistance of counsel. The grounds for a collateral attack on a final judgment are limited and an error that might justify a reversal on direct appeal will not necessarily support a collateral attack on the judgment. *Napoli v. United States,* 32 F.3d 31, 35 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995), citing *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239–40, 60 L.Ed.2d 805 (1979). Relief is, however, available on a 2255 petition for a constitutional defect such as ineffective assistance of counsel. *Hardy v. United States,* 878 F.2d 94, 97 (2d Cir. 1989). However, Vitarelli's argument concerning his ineffective counsel rests upon the validity of the claims of error which he makes. His initial argument is directed to the § 666 convictions and, in particular, whether a local legislator is an agent of local government,[5] as defined in the statute. We do not reach that issue since, based on the *Foley* case, we must set aside the bribery convictions in any event. Vitarelli also argues that the spillover effect of his conviction on the conspiracy count involving § 666 compels vacating his conviction on Counts Ten, a substantive § 666 charge, and Twenty-four, a tax violation count. As a result of *Foley,* the conviction on Count Ten must be vacated. We discuss the tax violation count hereafter. For the moment, it is enough to say Vitarelli has not established ineffective assistance of counsel at trial.

 The most vigorous challenge to the adequacy of representation is made by petitioner Santopietro. Hearings on that subject

lasted nearly a week. Interestingly, the challenge to counsel's representation is confined to the counts concerning the JTPA convictions.[6]

The City of Waterbury had a Department of Employment and Education Grants Administration ("DEEGA"). It administered all federal, state, local and private grants made to the City. Joseph Carrah was the Director and John Bolinski was the Fiscal Director. Although they had been appointed prior to Santopietro becoming Mayor, they continued in office at his sufferance.

Carrah and Bolinski embezzled and misused large amounts of DEEGA funds. At some point fairly early in the investigation, the two offered to cooperate and became government witnesses. They were indicted and plead guilty to felonies. Their testimony at trial was that, on a number of occasions, they shared their ill-gotten gains with the Mayor by whose grace they continued in office. Their scheme to accomplish these embezzlements and thefts involved the creation of special checking accounts which were not controlled or even known to the City of Waterbury's Comptroller. Santopietro authorized the opening of both of these accounts and was a signatory on one. Both co-conspirators testified at trial concerning cash advances given to Santopietro and other of his expenses covered by DEEGA accounts.

The attack on Santopietro's trial counsel centers around the fact that, while Carrah and Bolinski admitted to some $20,000 to $40,000 in defalcations, in fact they were responsible for much greater amounts. Had these larger amounts been brought out, Santopietro asserts such information would have had the effect of further impinging their credibility as government witnesses.[7]

---

**5.** The majority in *Foley* reserved decision on this issue, deciding instead on the basis of the $5,000 value element.

**6.** An allegation was made in the petition that there was also ineffective assistance of appellate counsel (a different attorney) in failing to raise the jurisdictional issues on the § 666 and the § 665 charges. As is discussed below, we disagree with the claims made with respect to § 665. As to § 666, prior to *Foley,* nobody had successfully made such a judicial challenge. This includes petitioner's present counsel who

represented another convicted defendant (Santopietro's brother) at trial. There is therefore no basis for claiming ineffective assistance of counsel in that regard.

**7.** The major single diversion of government funds concerned a check in the amount of $30,-000 taken from the Stewart McKinney Homeless grant and paid to the Aetna Insurance Company to open deferred compensation accounts in the amount of $7,500 each for Carrah, Bolinski and two other DEEGA officials. It is clear that this was an unauthorized expenditure. However, the

Santopietro was represented at trial by Hugh F. Keefe. Mr. Keefe is one of Connecticut's best known trial lawyers. He has been a fellow of the American College of Trial Lawyers for a dozen years. He has also held several important positions related to the judiciary, including being a member of the Connecticut Judicial Review Council and the Judicial Selection Commission, and being Chairman of the United States District Court Magistrate Appointment Committee.[8]

Keefe and the associate who worked with him were both called as hostile witnesses by petitioner at the hearing. Contrary to petitioner's claim that they had not investigated or prepared for the defense, their testimony established that they did pursue all evidentiary leads, but that with the exception of the extent of Carrah and Bolinski's crimes, the prospective witnesses were either uncooperative, hostile or unknowing.

The one area in which possibly helpful evidence was developed concerned, as noted above, the enormous extent of criminal activity involved in the administration of the DEEGA funds. Mr. Keefe acknowledged awareness of this, but decided strategically that it was not wise to exploit it. Carrah and Bolinski had openly admitted that they were thieves. However, they also indicated that they shared their ill-gotten gains with the Mayor. Their testimony established that at most the Mayor had benefited only to the extent of $5,000 or $6,000 from the DEEGA fund. To demonstrate that they had stolen hundreds of thousands of dollars would simply raise the specter that the Mayor's involvement and gains were even greater. The JTPA substantive offenses carried a maximum sentence of two years each. Keefe reasoned that to show that political appointees serving at the Mayor's discretion were even bigger thieves than had been admitted would have a substantial negative impact on Santopietro's overall defense. It did not seem wise to Keefe to demonstrate that the municipal corruption in Waterbury was even greater than that which the prosecution was charging.

We consider that to be a bona fide strategic reason for not pursuing the issue. In order to demonstrate constitutionally ineffective assistance of counsel, the petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see United States v. Zackson*, 6 F.3d 911, 919 (2d Cir.1993). In so doing, deference must be accorded to counsel's judgment, including what might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. In addition, petitioner must demonstrate that there was a reasonable probability that, but for counsel's errors, the proceeding would have resulted in an acquittal. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Judge Daly noted at sentencing that the evidence against Santopietro was overwhelming. We see no possibility that, even if the tactic did not rebound to the detriment of petitioner, further impeachment of Carrah and Bolinski would have resulted in acquittal on the JTPA counts.

Santopietro also challenges Keefe's failure to get into evidence what petitioner's counsel continually refers to as an "audit" of the DEEGA accounts. Petitioner's memorandum describes it as being a "virtual road map to discovering exactly how much was stolen from JTPA and DEEGA funds, by whom, from what accounts, and in many cases, how

---

Justice Department inquiries of the interested agencies indicated that these actions may not have been criminal. Consequently, they were not pursued by the government. Petitioner's counsel expressed great disgust at the light sentences administered to Carrah and Bolinski. It is not unusual for prosecutors who have been relying on cooperating individuals to achieve a significant conviction to emphasize the value of their cooperation and therefore, at least impliedly, request substantially reduced sentences. However, the ultimate sentence is always the Judge's responsibility and not the prosecutor.

**8.** As may be expected, not everyone has a high opinion of Keefe. Petitioner called as an expert witness John Williams, an equally well known trial lawyer who was emphatic in his criticism of Keefe's handling of the defense. However, it was shown that Williams and Keefe have been adversaries on many occasions, including a present case in which Keefe is representing a plaintiff suing Williams personally.

the thefts were concealed." Petitioner's memorandum of law, p. 21.

We first note that no audit was done. A special review was performed which indicated a large number of transactions which were not adequately supported in terms of existing documents and entries. That was the beginning point for an investigation and not evidence *per se*. Indeed, many of the questioned transactions were simply the shifting of money from one account to another for no observable purpose. The special review did not in most instances give any indication as to who ultimately profited from the improper transactions. While, as noted above, many of these transactions ultimately indicated substantial criminal conduct by Carrah and Bolinski, to emphasize them was at best a two-edged sword.

▇ Another area which petitioner claims Keefe should have pursued was a check which the government claimed had been cashed by John Carrah, with the funds transmitted to the Mayor while he was in Chicago. As petitioner notes, the back of the check was clearly stamped "For Deposit Only." However, the government was prepared to prove, and Mr. Keefe apparently knew that, despite that endorsement, the check was not deposited but was in fact cashed.[9] In totality, we find the claims of ineffective assistance of counsel totally lacking and affording no grounds for setting aside other conviction counts.[10]

### The Tax Counts

▇ Both Santopietro and Vitarelli were convicted on tax fraud counts. They rely on that portion of the *Foley* decision which set aside Foley's conviction on the tax charge and ordered a new trial to support their claim for the necessity of a new trial. The situation in *Foley* was quite different. Foley was convicted of tax fraud for assisting a group of developers in their fraudulent overstatement of their deductions on their federal income tax returns. A business is allowed to deduct the ordinary and necessary expenses of its operation, but not money paid directly or indirectly as bribes or kickbacks. In the *Foley* case, the jury had two possible bases on which it could find him guilty. The first was that the deductions were not a legitimate business expense and therefore not ordinary and necessary. The second basis was that the bribes were illegal and therefore not properly deducted. Since the Court concluded that the bribes were not illegal under § 666, and since the Court could not determine whether the jury's verdict was based on the view that the bribe payments were not ordinary and necessary or on the premise that they were illegal, a new trial was deemed necessary. None of the tax counts in this case is subject to the same sort of challenge. Count Twenty-four charged Vitarelli with understating his income for the tax year 1988 and Count Twenty-eight made the same charge against Santopietro. Count Twenty-nine made a similar charge against Santopietro for the calendar year 1989. None of those offenses turned upon whether the receipt of bribes constituted a federal offense; these bribes were simply unreported income. Consequently, we reject petitioners' argument that *Foley* mandates a new trial in that regard.

▇ Vitarelli makes additional arguments, one of which is that the government must

9. When cashing a check, a bank will ask for identification and an account number against which it can charge the check if it turns out to be uncollectible. This check had an account number and a driver's license number indicating that the check had been cashed. Moreover, a subpoena of the bank records showed that it does not appear as a deposit.

10. Another issue raised by petitioner is that a former reporter from the local newspaper, The Waterbury Republican, had interviewed Santopietro in Waterbury on November 2 and saw him in the late evening of November 3, 1992 in Waterbury, while the government's evidence placed him in Atlantic City, New Jersey, between those times. The problem with this argument is that it only takes a few hours to get to Atlantic City and consequently, putting Santopietro in Waterbury at two different times, thirty-six hours apart, would not prove anything. In addition, The Waterbury Republican had been influential in exposing a number of the Mayor's misdeeds so that the reporter, if called by the defense, could have been turned into a prosecution witness. For example, petitioner maintains that certain of the DEEGA payments were subsequently repaid from the Mayor's account, but this appears to have occurred only after the newspaper exposed questionable travel expenses.

## 154

prove that he acted wilfully in understating his income. The issue of adequate proof of willfulness was raised on appeal and decided against Vitarelli. He may not now raise this issue again in this proceeding.

 Vitarelli also challenges Judge Daly's charge to the jury on the significance to be given to the filing of an amended return. The government proved that, after he had learned of its investigation of him, Vitarelli filed an amended tax return. He maintains that *United States v. Dyer*, 922 F.2d 105, 108 (2d Cir.1990), indicates the impropriety of any reference to the amended return. That misstates the *Dyer* holding.

 In *Dyer*, the trial judge instructed the jury that they could infer a consciousness of guilt from the filing of an amended return since the filing of an amended tax return was an admission that he knew that the original was false when filed. The Court of Appeals held that the filing of an amended return is not an admission of fraud and that it can only support an inference of a mistake. Judge Daly was apparently well aware of the *Dyer* holding since his charge avoided any such direction to the jury, but merely allowed the jury to consider the amended return along with the other evidence.[11] Consequently, we reject this argument, which also was a matter for appeal and not a post-conviction petition.[12]

### The JTPA Offenses (18 U.S.C. § 665)

 Santopietro contends that in order to have established a violation of 18 U.S.C. § 665, the government was required to plead and prove that he had embezzled or misapplied or obtained by fraud moneys subject to the financial assistance agreement between the federal government and Waterbury. He argues that it was the government's burden to prove that the JTPA funds were knowingly converted. The evidence at our hearings established that most of the DEEGA funds were federal moneys and indeed much, and perhaps most, were JTPA funds.[13] However, it was clear that these funds were commingled with some state and private funds as well as other federal funds. It is apparently a common procedure for municipalities not to segregate into separate accounts the funds it receives from various sources for job training purposes. Consequently, the government could not possibly prove that any specific funds turned over to the Mayor came exclusively from JTPA funds. Santopietro likens his § 665 argument to the approach taken by the Court of Appeals with respect to § 666. Initially, the government argues that these claims are waived since he received concurrent two-year sentences on all of the substantive JTPA counts of conviction and has already served substantially longer than that.[14] We reject that argument since, under the Sentencing

11. Judge Daly gave a charge on willfulness with respect to filing false tax returns as it pertained to four defendants, including Vitarelli. He instructed the jury as follows:

Lastly, here, ladies and gentlemen, I turn to the willfulness element. Again, willfully means a voluntary and intentional violation of a known legal duty, that is to say, acting with a bad purpose to either disobey or disregard the law. The conduct of the defendant under consideration cannot have been found to be willful if you determined that he acted through negligence, even gross negligence, inadvertence, justifiable excuse, or mistake. In making this determination, you are entitled to consider all of the evidence in this case which bears on his state of mind, including any evidence that he ever amended the tax return in question and the timing of the filing of any such amended return.

Only, ladies and gentlemen, if you find that the government has proven this willfulness ele-

ment beyond a reasonable doubt may you find the defendant under consideration guilty of the count in question. If this or any other element goes unsatisfied, you must, of course, return a not guilty verdict for the defendant.

12. Vitarelli also argues that his conviction on the tax charge was tainted by virtue of his prosecution for taking bribes. We have already rejected that argument above.

13. One witness stated that 30% of all DEEGA funds came from JTPA. Another witness put it at 70%. We do not view the distinction as being of any consequence.

14. The government also argues that since Santopietro indicates that he knew he had a basis for challenging the JTPA offenses at trial, the failure to challenge the conviction on appeal has waived the claim. In light of our subsequent opinion on the merits, we do not deal with that issue.

Guidelines approach, the number of offenses of conviction affects the parameters.

The commingling issue was raised at trial. Judge Daly held that the funds were federal for purposes of the statute. That decision is consistent with *Hayle v. United States,* 815 F.2d 879, 882 (2d Cir.1987). To accept Santopietro's argument would in most instances make it impossible to obtain a conviction for misuse of JTPA funds because of the addition of funds from other sources, including other federal sources.[15] In the charge to the jury, Judge Daly instructed that the federal grant money remained the property of the United States as long as the federal government exercised supervision and control over the funds and over their ultimate use. The Waterbury City Manager testified that the federal rules governing the use of JTPA funds controlled all funds commingled with federal funds. We therefore reject this argument in its entirety.

### Santopietro's Claim of Prosecutorial Misconduct

Santopietro also claims there was prosecutorial misconduct. This claim is frivolous. It is based upon a *post hoc* view of the evidence, including adjustments that were made in the City's accounts when it was known that an investigation was underway with respect to bribery and corruption. The petitioner demonstrated that, as to one exhibit, the witness and the Assistant United States Attorney were talking about two different things. (There were two checks in the same amount.) In the other instances, the prosecutor was unaware of the significance of certain account numbers. At most, the petitioner has demonstrated a few simple errors by the prosecution which we find were not done maliciously.

Even where there is prosecutorial misconduct, the petitioner must demonstrate that it had a substantive and injurious effect and influence on the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). The general claim is made that the government presented the testimony of Carrah and Bolinski, whom the government knew were perjuring themselves. Without a doubt, Carrah was an evasive witness, particularly on cross examination.[16] That is not an uncommon attribute of cooperating defendants who, while attempting to assist the government to get credit for their cooperation in their own sentencing, will simply attempt to minimize their own culpability. Additionally, Bolinski made a couple of misstatements and gave a few inconsistent answers.[17] Santopietro makes much of what he claims was a "forged signature" of his on a check. It is clear that the signature was not the Mayor's, but there was nothing to indicate that the co-conspirator, who apparently put the signature on the check, was not authorized to do so. Forgery requires an intent to deceive, an intent which was not proved here. *See* Conn.Gen.Stat. §§ 53a–138–53a–140.

The evidence was clear that both Carrah and Bolinski were directed by the prosecutors to tell the truth. There was a total absence of any evidence of prosecutorial misconduct. We therefore deny the petition on this ground.

### Conclusion

We GRANT all three petitioners' motions (doc. no. 1 on all three petitions) to set aside their convictions on the 18 U.S.C. § 666 counts. We deny their petitions with respect to all other convictions.

A preliminary inquiry indicates that with respect to resentencing petitioners Santopietro and Pisciotti, there are evidentiary issues which were previously subsumed by the bribery convictions that bear upon the appropriate Sentencing Guidelines for the other counts and have not heretofore been resolved.

---

**15.** Federal control of mingled funds or transferred funds is all that is necessary to establish a basis for federal criminal jurisdiction. *See e.g. United States v. Long,* 996 F.2d 731 (5th Cir. 1993).

**16.** He did outright lie about the purchase of some flowers but Attorney Keefe caught this on cross examination.

**17.** In at least one instance, Bolinski testified incorrectly to matters he believed to be the truth since he was unaware of the circumstances at the time that he testified.

With respect to Santopietro and the two counts of bank fraud, while the amount of the loans from the two banks are known, the extent to which there was a loss from the fraud must be determined to establish the proper Guideline calculation. In addition, the violations of 18 U.S.C. § 665 involving the use of funds from DEEGA will require a calculation of the amount actually involved. While the indictment indicates a loss of $35,-000, the testimony at the hearing indicated that this defendant's share was only $5,000 or $6,000. In addition, with respect to the tax fraud counts, the amount of the tax loss for each of the years in question will have to be calculated separately.

With respect to Pisciotti's conviction under Count Six for bank fraud in violation of 18 U.S.C. § 1344, the amount of the loan receipts which was fraudulent will have to be determined. With respect to both petitioners, a presentencing conference will be held on December 9, 1996 at 3:00 PM to discuss the resolution of these issues. In addition, counsel and Vitarelli are advised that the Court will consider making an upward departure with respect to all three defendants. While their bribery conduct has been held not to be a federal offense, it would appear to be a state offense which disrupted the legal functioning of the municipal government of Waterbury.