**UNITED STATES of America,**

v.

**Eric J. FERRARA, Defendant.**

**No. 97–CR–777 (DRH).**

United States District Court,
E.D. New York.

Jan. 9, 1998.

Zachary W. Carter, U.S. Atty., Garden City, NY by Loretta E. Lynch, Asst. U.S. Atty., for U.S.

Miller & Skubik, Islandia, NY by Richard A. Miller, Jacqueline M. Skubik, for Defendant.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

By letter motion dated October 8, 1997, defendant seeks the following items of relief:

1. Dismissal of the indictment for its purported failure to allege a federal crime;

2. Dismissal of the indictment upon the ground that it is the product of defective grand jury proceedings or, alternatively, an order directing an *in camera* inspection of the grand jury minutes to determine the adequacy of the proceedings before that body;

3. A determination that the statute which defendant is charged with violating, to wit, 18 U.S.C. § 666 ("Section 666"), violates constitutional principles of federalism; and

4. A Bill of Particulars.

## BACKGROUND

Defendant is charged in a three count indictment with giving, or having offered to give, bribes to three members of the Southampton Town Board (the "Town Board") with the intent to influence those members in relation to a project for the construction of a radio tower in Noyac, a community located within the Town of Southampton (the "Town").

The relevant charging language from Counts One and Two of the indictment reads as follows:

[T]he defendant ERIC J. FERRARA did knowingly, intentionally and corruptly give, offer and agree to give something of value to a member of the Town Board of the Town of Southampton, with the intent to influence a member of the Town Board in connection with business and a transaction and series of transactions of the Town of Southampton involving a matter with a value of over $5,000, to the Town, to wit: a request for change of zoning of land within the Town, which matter affected the financial interest of the Town of Southampton, all while the Town of Southampton was in receipt, over a one year period, of benefits in excess of $10,000 in Federal assistance.

(Indictment ¶¶ 7, 9.)

Count Three reads the same except it does not include the word "give" after the words "knowingly, intentionally and corruptly." (*Id.* ¶ 11.)

The present attack on the indictment is not defendant's first. An earlier indictment (97 CR 364) was dismissed by me for facial insufficiency pursuant to a Memorandum and Order dated July 21, 1997. The language in the two accusatory instruments is essentially the same except that the earlier one did not contain the following language with respect to the claim that the transaction had a value of over $5,000:

[T]o wit: a request for change of zoning of land within the Town which matter affected the financial interests of the Town of Southampton.

(*Id.* ¶¶ 7, 9, 11.)

In *United States v. Foley*, 73 F.3d 484 (2d Cir.1996), Judge Kearse, writing for the panel, explained that an indictment which simply tracks the statutory language of Section 666 does not properly allege a violation, given the *implicit* element of the crime, *viz.*, that the $5,000 or more in value must affect either "the financial interests of the [Town or] federal funds directly." *Foley*, 73 F.3d at 493.

Indictment 97 CR 364 suffered from the pleading defect underscored in *Foley* in that it did not contain that implicit element, thereby triggering the previously noted dismissal.

The defect cited in the July 21, 1997 Memorandum and Order is not found in the new indictment, which—unlike its predecessor—links the $5,000 value requirement to the Town. That instrument is attacked, however, upon the ground that the financial impact upon the Town must be "adverse" for a violation of Section 666 to be properly charged. (Oct. 8, 1997 Jacqueline M. Skubik Letter ("Skubik Letter") at 2.)

Proceeding *seriatim*, the Court will address the current attack upon the sufficiency of the indictment, as well as the alternate items of relief sought in defendant's letter motion. In addition, a decision will be rendered regarding defendant's earlier motion to suppress certain incriminating statements said to have been uttered by the defendant on the date of his arrest. That motion, which accompanied the earlier attack on the indictment, was originally rendered moot via the dismissal of indictment 97 CR 364. The issue was raised again by defendant's motion dated September 23, 1997.

## DISCUSSION

I. *Section 666 Does not Require Proof of an Adverse Financial Impact Upon the Town*

■ The portion of Section 666 that defendant is charged with violating provides in pertinent part:

a) Whoever, if the circumstance described in subsection (b) of this section exists—

. . . .

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of a . . . local . . . government, or any agency thereof, in connection with any business, transaction, or series of transactions of such . . . . government, or agency involving anything of value of $5,000 or more, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666.

The "circumstance described in subsection (b)," referred to in the first clause of Section 666(a), is that the "government[] or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidiary, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b).

For purposes of the present motion, it is not disputed that each of the individuals who were purportedly offered a bribe were, as Town Board members, agents of a local government, which government received more than $10,000 in federal monies within the appropriate time period. Nor is it disputed that the conduct alleged constituted an effort to influence those members in connection with the municipal business. The sole focus of the attack is the $5,000 requirement. In defendant's view, the government must plead and prove that the bribery attempt, if successful, would have caused a loss of $5,000 or more to the Town.

Initially, it should be noted that the proposition advanced does not find support in the language of Section 666. But, of course, the additional element of the crime articulated in *Foley* is not apparent from a perusal of the statute. And it is that decision, as supplemented primarily by language from *Santopietro v. United States*, 948 F.Supp. 145 (D.Conn.1996), which is the predicate for defendant's present argument. (Skubik Letter at 2–3.)

To place the issue raised in context, a brief review of the reasons for the enactment of Section 666, and comments about its $5,000 value requirement, would appear to be in order.

Section 666 was enacted to fill a perceived gap in the legislation which then existed to protect federal funds disbursed to state and local governments from being improperly diverted. Section 201 of Title 18 prohibited corrupt payments to "public officials," but it was unclear whether individuals not in the employ of the federal government fell within the ambit of the statute. Moreover, success-

ful prosecutions were impossible in those instances where title to the federal property had passed to a recipient before the property was stolen, or where the federal character of the funds was irredeemably lost due to commingling with non-federal monies. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510. ·

██ In an effort to correct those problems, Congress sought "to preserve the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them." *United States v.. Westmoreland*, 841 F.2d 572, 578 (5th Cir.1988). *See United States v. Simas*, 937 F.2d 459, 463 (9th Cir.1991) ("By enacting section 666, Congress plainly decided to protect federal funds by preserving the integrity of the entities that receive the federal funds rather than requiring the tracing of federal funds to a particular illegal transaction.") *See also Foley*, 73 F.3d at 491 (citing with approval both *Westmoreland* and *Simas* for the propositions previously stated). As a result, a violation of Section 666 may occur even if the corrupt transaction does not involve monies originally derived from a federal source. *See United States v. Coyne*, 4 F.3d 100, 109–10 (2d Cir.1993).

Since Section 666 targets those individuals who have the power to administer federal funds at the local level, rather than the funds themselves, defendant's dollar-based argument seems out of sync with the statutory scheme. There is certainly nothing in the legislative language which suggests that demonstrable financial loss is a precondition to criminality.

But what is the purpose of the $5,000 value requirement if it is not meant to signify loss to the protected organization? As noted in *Foley*, Section 666(a)(1)(B) is "silent" in that regard. *See Foley*, 73 F.3d at 489. Yet, a plain reading of the statute seems to indicate that the purpose of the $5,000 requirement is to assure that only corrupt transactions which may be categorized as *significant*—as measured against that dollar amount—will activate Section 666. *See United States v. Apple*, 927 F.Supp. 1119, 1125 (N.D.Ind. 1996); *United States v. Mongelli*, 794

F.Supp. 529, 530 (S.D.N.Y.1992). *Foley* is not at odds with that conclusion, for the issue there—as will be discussed momentarily—was the appropriate point of reference for the value requirement (*Foley*, 73 F.3d at 489), not the purpose for its inclusion in the statute.

Having discussed the reasons underlying the enactment of Section 666, and the purpose of its $5,000 value requirement, attention will now be refocused on defendant's *Foley-Santopietro* based attack of the indictment. In that regard, a brief discussion of those cases will be useful.

*Foley*, a Connecticut legislator, was convicted, *inter alia*, of accepting a bribe involving a transaction with a value of over $5,000 to a private entity, *viz.*, Fleet Bank. Absent from the proof, however, was any indication of the value of the transaction to the State of Connecticut. In reversing the bribery portion of his conviction, the Second Circuit concluded that the proven transaction was not violative of Section 666(a)(1)(B), explaining that reference must be made to the protected organization's financial interests in determining whether the "anything of value of $5,000 or more" statutory requirement has been satisfied. *Foley*, 73 F.3d at 493. If value is measured from the perspective of the person or entity tendering the bribe, the transaction does not "touch upon federal funds" for it "affect[s] neither the financial interests of the protected organization nor federal funds directly." *Id.* Absent that nexus, we have been told that Section 666 is inapplicable.

The *Foley* Court did not suggest, however, that its language "affect[ing] ... the financial interests of the protected organization" required that the effect be negative, that is, cause a diminution in the organization's financial status. Indeed, neither the word, nor concept, of "loss" is to be found in *Foley*, · although it could have been readily included had that been the message intended to be conveyed.

The situation is otherwise with respect to *Santopietro*, 948 F.Supp. 145, in which the term "loss to the government" is implicitly treated as synonymous to the *Foley* language

of "affect[ing] ... the financial interests" of the protected organization. *Santopietro*, 948 F.Supp. at 149–50. Santopietro and other co-defendant political leaders were convicted of numerous federal offenses, including having violated the anti-bribery provisions of Section 666(a)(1)(B). Those convictions were affirmed on appeal. Thereafter, the *Foley* decision was issued by the Second Circuit, which gave rise to the habeas corpus petitions filed in *Santopietro*. In granting the requested relief as to the bribery counts, the district court noted:

> It is clear that [the bribery counts] were not plead[ed] in the *Foley* fashion or proved in that regard. Moreover, the jury was specifically instructed that in order to convict under § 666 the "anything of value" would be "any item ... that the recipient or the giver considers to be worth something." ... No reference was made to a loss by the government. Consequently, we have no alternative except to grant the petitions as they pertain to all the substantive § 666 counts and the first conspiracy count.

*Id.* at 150 (footnote omitted).

From the above excerpt, it is clear that:

1. The targeted convictions were vacated for the failure of the indictment and the trial court's charge to dovetail with the after-the-fact instruction provided in *Foley* as to the appropriate reference point for the $5,000 value requirement, where federal funds are not directly impacted by the charged conduct; and

2. The district court's use of the term "loss to the government" in its reference to *Foley* is dictum.

To partially reiterate, *Foley* does not support defendant's argument. To the extent that dictum in *Santopietro* indicates that the effect on the protected organization must be financially adverse to implicate Section 666, this Court respectfully declines to adopt that view.

Defendant's approach, if adopted, would virtually eviscerate Section 666. Consider the following example. Attorney Smith is hired to defend hundreds of thousand of dollars in tax certiorari suits filed against a town. He received the nod over other applicants by bribing decision-making officials. Clearly over $5,000 in value from the town's perspective is involved, but what effect will Smith's hiring have on public coffers? Would another applicant, if selected, have better served the town's financial interest?

It is certainly not inconceivable that the corrupt attorney might more effectively represent the client. There is no necessary inverse correlation between corruption and competence, at least in the short run. If it could not be established that Smith's selection—procured via bribes—had an adverse impact on the town's financial well-being, would the transaction be beyond the reach of Section 666?

And if an adverse financial impact on a municipality is a precondition to a successful prosecution, at what point is that assessment to be made? Assume that a builder obtains the necessary approvals, by bribing local officials, to construct a major housing project. In time, the project may be expected to generate tax revenues. But will those sums be more than counterbalanced by the expenditure of public monies to provide police and fire protection, together with other municipal services, to the new area? In the final analysis, will the project produce a net gain or loss for the municipality? And what time frame should be considered in endeavoring to make that determination—one month, one year, ten years, or some other period?

Section 666's applicability does not depend on the government's ability to answer such largely unanswerable questions. Congress fashioned the statute to avoid the type of accounting quagmires which defendant invites us to enter. As noted previously, the courts—including the Second Circuit—have taken cognizance of the statutory mechanism created to protect federal funds distributed to entities including local governments. Simply stated, the focus is on the individuals who control the dollars, not the dollars themselves. And the $5,000 value requirement is present to limit federal jurisdiction to significant, i.e., important transactions, again viewed from the protected organization's perspective.

Defendant's motion to dismiss the indictment for purported facial insufficiency is denied.

## II. The Present Prosecution Does not Violate Principles of Federalism

■ Defendant contends that the present prosecution is violative of "the principles of federalism embodied in the Tenth Amendment[1] to the United States Constitution" because (1) the government is endeavoring to federalize "local conduct unrelated to federal monies," and (2) the monetary threshold of $10,000 is so low as to constitute "overreaching." (Skubik Letter at 9.) These arguments are without merit.

Section 666 was apparently passed pursuant to Congress's tax and spending power as set forth in Article I, Section 8. (See id.) Accordingly, Section 666 is not violative of the Tenth Amendment unless the activities sought be regulated exceed that power. Contrary to defendant's assertion, however, the conduct which is the subject of the present indictment is related to the federal government's legitimate interest in protecting federal funds disbursed to local governments.

■ Federalism has not been compromised here. See United States v. Bigler, 907 F.Supp. 401, 402 (S.D.Fla.1995); United States v. Cantor, 897 F.Supp. 110, 113 (S.D.N.Y.1995). The federal government has a right to attach reasonable conditions to the disbursements of its funds. See New York v. United States, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). State and local governments are free to accept or reject federal monies so encumbered. The choice rests with them. See New York v. United States, 505 U.S. at 168; Cantor, 897 F.Supp. at 113 (citation omitted). And their ability to prosecute local bribery schemes is not impaired either. Rather, each jurisdiction—state and federal—may prosecute offenders consistent with their respective interests. This circumstance is not violative of the Tenth Amendment. See United States v. Bailey, 990 F.2d 119, 126 (4th Cir.1993); see

also United States v. Smith, 987 F.2d 888, 893 (2d Cir.1993).

In sum, defendant's constitutional attack on Section 666 is rejected.

## III. Defendant's Motion for an Inspection of the Grand Jury Minutes is Denied

■ Defendant has moved to dismiss the indictment pursuant to Fed.R.Crim.P. 12(b)(1) on the ground that there were defects "in the institution of the prosecution." In aid of that application, he also requests "that the Court conduct an in camera inspection of the grand jury minutes, [and] voting and attendance records of the proceedings which resulted in the two indictments against Eric Ferrara." (Skubik Letter at 10.) Defendant additionally seeks the "release [of] copies of the grand jury minutes to defense counsel pursuant to Rule 6(e)(3)(C)(ii)." (Id.)

Defendant questions whether the required procedures were followed by the grand jury in returning the present indictment, and whether sufficient evidence as to each element of each crime charged was placed before it, including evidence that the financial impact upon the Town was adverse. (Id. at 10–12.)

As noted above, there is no requirement of adverse impact under Section 666, so that concern of defendant need not be addressed further. Moreover, his other concerns of possible procedural and substantive irregularities before the grand jury, are just that—concerns, devoid of any specificity or particularized need sufficient to warrant the relief requested. See United States v. Sells Eng'g, Inc., 463 U.S. 418, 443, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983).

■ The strong presumption of regularity in grand jury proceedings cannot be outweighed by purely conclusory or speculative allegations of misconduct. See United States v. Abcasis, 785 F.Supp. 1113, 1120 (E.D.N.Y. 1992). Accordingly, defendant's request for an inspection of the grand jury minutes and for review of the attendance and voting records is denied.

---

1. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

## IV. Demand for Bill of Particulars

The scope of the defendant's demand for a bill of particulars was significantly narrowed during the course of oral argument on July 14, 1997. Based on discovery which postdated service of the demand, the "only area" which remained unresolved as of July 14th concerned defendant's request for "additional information relating to the dates, times and places, and some specificity as to what was [purportedly] offered" by defendant to the various Town Board members as alleged in Counts One, Two, and Three. (July 14, 1997 Tr. ("Tr.") at 35–36.)

The purpose of a bill of particulars is to assure that a defendant is sufficiently apprised of the charges against him to permit preparation of an adequate defense and to allow him to assert the plea of double jeopardy if subsequent charges are filed based on the same conduct. *See United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988); *United States v. Salazar,* 485 F.2d 1272, 1278 (2d Cir.1973).

Here, each of the three counts pertains to a different Town Board member, the names of which are known to the defense. The defense has been told that "money was offered to the three [Town Board members] in varying amounts." (Tr. at 34.) The government has agreed to "particularize, in a separate letter, the approximate amounts of money offered by the defendant." (Gov't's Mem. at 26.)

With respect to Counts One and Two, the government has furnished defendant with tapes of recorded conversations which "make reference to . . . bribe attempts . . . ." (Tr. at 30.) As to Count Three, no tapes of recorded conversations apparently exist. However, that count, unlike the other two, alleges the date of the charged crime with particularly, to wit, as having occurred in or about May 1996. (Indictment ¶ 11.)

Count One gives a time frame of between December 1995 and January 1997, while Count Two alleges conduct between April 1996 and January 1997. (*Id.* ¶¶ 7, 9.) As to each of these counts, the government's proof involves an ongoing series of discussions. (Tr. at 37.) For the defendant to properly prepare his defense to Counts One and Two, further information is required. Accordingly, the Court, in the exercise of its discretion, directs the government to furnish defendant, within ten business days of the date of this Order, the following particulars:

The approximate date of each conversation during which the government claims defendant offered money as alleged in Counts One and Two.

The government need not endeavor to furnish any more specificity than the witnesses' memories permit and designations of "on or about" or "between" certain dates may be utilized to the extent necessary, again based on the recollection of the witnesses involved; if a witness is unable to provide any more specificity than presently appears in the indictment, that circumstance shall be made known to the defense.

Except insofar as noted above, defendant's request that the government be directed to furnish further evidentiary particulars regarding the charges in the indictment is, in the exercise of my discretion, denied. *See Salazar,* 485 F.2d at 1277–78; *United States v. Andrews,* 381 F.2d 377, 377–78 (2d Cir. 1967).

## V. Motion to Suppress Statements

Defendant has moved to suppress incriminating statements that he made shortly after his arrest in the presence of the Justice Department Investigator Daly, and Postal Inspectors Farash and McDermott, which statements have been designed as Statements One, Two, and Three in the subsequent portions of this decision.

A suppression hearing was conducted on July 14, 1997. My findings of fact and conclusions of law are set forth below.

### A. Findings of Fact

Defendant was arrested at his home at approximately 9:30 a.m. on January 15, 1997, pursuant to an arrest warrant.

Upon their arrival at defendant's home, Investigator Daly and Postal Inspectors Farash and McDermott were invited to enter. Once inside, they joined the defendant, his wife, child, and an household employee. De-

fendant was advised he was under arrest for bribery, and was read his *Miranda v. State, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)* rights which he said he understood. He then changed his clothes to something more suitable for his court appearance, which he had been told would occur later that day. At about the same time, he asked if he could contact his attorney. In response, one of the officers said that his wife could make the call, and she was given, *inter alia,* directions to the federal courthouse in Uniondale. The defendant "instructed" his wife to call his attorney. (Tr. at 48.) The officers were in the house for approximately fifteen to twenty minutes.

Defendant was then placed in Investigator Daly's car for transport to the Postal Inspector's Office in Hicksville for processing. Once in the car, defendant was instructed that he was going to be asked "pedigree questions about his background." (Tr. at 50.) He was also told "that [the officers] would like him to cooperate." (*Id.* at 50.) He was reminded again that he did not have to speak absent his lawyer, but he indicated he wanted to cooperate and that "he would answer questions and he would stop if he felt uncomfortable with it." *Id.*

### 1. *Statement One*

While Inspector Farash was asking pedigree questions, using a multi-page document which was received into evidence as Government Exhibit I, defendant opined that he was "the unluckiest guy in the world" because he "got caught the first time [he] ever did anything like this." (*Id.* at 51, 77.) This comment was volunteered by defendant, unprompted and unrelated to any of the pedigree questions being asked by Inspector Farash, or to any other comment or conduct of the officers.

### 2. *Statement Two*

Soon thereafter, their travels took them by a radio tower in Manorville at which time "[the officers] asked him some questions about the Manorville tower, which his company owns." (*Id.* at 52.) More specifically, defendant was asked, basically, "did you take care of any Brookhaven officials," meaning "[d]id you payoff Brookhaven officials for this tower?" (*Id.* at 53.) To those pointed, non-

pedigree questions defendant answered: "This is the first time I've ever done anything like this. I know what you're thinking, but it didn't happen here." *Id.*

### 3. *Statement Three*

Inspector Farash resumed asking pedigree questions from Government's Exhibit I, which questions were specifically identified as such to defendant. One of those pedigree questions concerned the names of his business associates. That question produced the volunteered, non-responsive comment "they had nothing to do with this" and that he had done it "on his own." (*Id.* at 55, 92, 125.)

The trip from defendant's home to Exit 63—where Inspector McDermott had left his vehicle earlier in the day prior to the arrest—took between thirty and forty minutes. All three of the incriminating statements which are the subject of this branch of defendant's motion were made during that time. The defendant's demeanor throughout was calm and friendly. The same may be said generally of the officers.

### B. *Conclusions of Law*

### 1. *Statements One and Three*

Statements One and Three are admissible. Each represents a "spontaneous and unsolicited declaration" (*United States v. Montana,* 958 F.2d 516, 519 (2d Cir.1992)) by defendant in response to routine pedigree questions. Such inquiries do not constitute interrogation. *See Pennsylvania v. Muniz,* 496 U.S. 582, 600–02, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). The mere fact that defendant had earlier asked to contact counsel does not alter that result (*see United States v.. Stewart,* 770 F.Supp. 872, 879 (S.D.N.Y. 1991)), nor does the fact that the government already knew the answers to some of the pedigree questions asked of the defendant. *See United States v. Carmona,* 873 F.2d 569, 573 (2d Cir.1989).

In sum, the government has established by a preponderance of the credible hearing evidence that, given the totality of the circumstances, Statements One and Three are admissible. Neither was the result of interrogation or its functional equivalent. The

defendant was advised that he was being asked simply pedigree, or background, questions. Yet, he elected to answer such inquiries in a non-responsive and incriminating manner. Defendant's motion to suppress the government's intended use of those statements at trial is denied.

### 2. *Statement Two*

■ Statement Two is the product of interrogation. The line of inquiry initiated by the officers about the radio tower in Manorville was unrelated to Inspector Farash's efforts to obtain pedigree information, and was reasonably likely to and, in fact, did elicit incriminatory statements from the defendant. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

The government acknowledges that the statement was the result of interrogation, but argues for its admissibility on the ground that "the defendant made a knowing and selective waiver of his right to counsel." (Oct. 2, 1997 Loretta E. Lynch Letter ("Lynch Letter") at 3–4.)

■ It is undisputed that defendant, after being given his *Miranda* warnings, asked to speak to his attorney. When told that his wife, not him, could make the telephone call, he instructed her to do so. At that point, any further inquiry had to be confined to eliciting basic identifying data (*see United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986)) or, to the extent necessary, clarifying defendant's intent to invoke his right to counsel. *See United States v. Gotay*, 844 F.2d 971, 975 (2d Cir.1988). Yet, immediately thereafter, as the officers exited defendant's home and entered Investigator Daly's car for the trip to Hicksville, defendant was advised to cooperate. As noted by the government, "[s]uch an unsolicited request for cooperation is considered the functional equivalent of interrogation." (Lynch Letter at 5 (citing *United States v. Montana*, 958 F.2d 516, 518 (2d Cir.1992).)) Granted, defendant was simultaneously advised again of his right not to speak absent counsel, and he made no incriminating statement then. It is also true that defendant said, as part of this colloquy, that "he would answer questions and he would stop if he felt uncomfortable with it." (Tr. at 50–52.)

■ A defendant may change his mind after invoking his right to counsel (*see United States v. Gazzara*, 587 F.Supp. 311, 324 (S.D.N.Y.1984)), and may also selecting waive his *Miranda* rights, deciding to answer some questions but not others. *See Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir.1988); *United States v. Thierman*, 678 F.2d 1331, 1335 (9th Cir.1982). But that is not what happened here.

The officers were not required to alter their plans on the morning of January 15, 1997 to permit the defendant to call his attorney from his home. Yet, once the request to contact counsel was made, defendant could not legitimately be interrogated, but he was. He was immediately advised to cooperate, the functional equivalent of interrogation. That improper comment by the officers is what prompted defendant's statement that he wanted to cooperate, and would answer certain questions. Since the subject of cooperation should not have been broached by the officers, it may not be used as the basis for the notion that defendant selectively waived his right to counsel after requesting permission to contact his attorney moments before.

In sum, the government has failed to establish that the defendant "knowingly and intelligently waived his privilege against self-incrimination and his right to counsel" as to Statement Two. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### C. *Conclusion Regarding Statements*

Defendant's motion to suppress Statement Two is granted, but is denied as to Statements One and Three.

### *CONCLUSION*

For the reasons stated above, the branch of defendant's motion which seeks a dismissal of the indictment is denied; his motions for a bill of particulars and to suppress certain incriminating statements purportedly made on the date of his arrest are granted in part and denied in part.

SO ORDERED.